[No. 58415-0. En Banc. January 6, 1995.]

THE STATE OF WASHINGTON, *Respondent*, v. JONATHAN
LEE GENTRY, *Appellant*.

*Jonathan Lee Gentry,* pro se; *Nance, Iaria & Gombiner, Robert H. Gombiner,* and *Michael Iaria; Frederick D. Leatherman, Jr.,* for appellant.

*Russell D. Hauge, Prosecuting Attorney,* and *Brian T. Moran, Pamela B. Loginsky,* and *Donald J. Porter, Deputies,* for respondent.

*Gregory J. Wrenn* on behalf of the American Civil Liberties Union of Washington Foundation and *Lawrance A. Edwards* on behalf of Loren Miller Bar Association, amici curiae for appellant.

*Jeff Ellis* of *Seattle-King County Public Defender Association* on behalf of Murder Victims Families for Reconciliation, amicus curiae for appellant.

*Seth Aaron Fine* on behalf of Friends of Diane and Families and Friends of Violent Crime Victims, amicus curiae for respondent.

*Mark A. Panitch* on behalf of National Organization of Parents of Murdered Children, amicus curiae for respondent.

*Christine O. Gregoire, Attorney General,* and *Leslie V. Johnson, Assistant,* amicus curiae for respondent.

ANDERSEN, C.J. —

## FACTS OF CASE

Defendant Jonathan Lee Gentry appeals his conviction and death sentence for the murder of a 12-year-old girl in Kitsap County.

The following is a summary of the facts that were developed during the 6-week trial and approximately 8 weeks of

hearings on related motions. The facts pertinent to each issue raised by the Defendant are more fully set forth in the discussion of the various issues.

In early June 1988, the 12-year-old victim lived with her father and stepmother in Pocatello, Idaho. On June 11, 1988, she traveled to Kitsap County, Washington, to spend the summer with her mother at her mother's home near Bremerton. On June 13, 1988, at approximately 4:30 p.m., the young victim went for a walk. She was expected home at 6 p.m. for dinner, but never returned.

Her body was found early June 15, 1988, behind a large log at the bottom of a path running from a trail through a wooded area adjacent to Rolling Hills Golf Course, near Bremerton, Washington. The victim's eyeglasses, earring and a bouquet of flowers were found approximately 148 feet up the footpath on and near the main trail.

The victim appeared to have been sexually assaulted, as her jeans and underpants were pulled down and her T-shirt and bra pulled up. Her blue sweatshirt had been removed from one arm and pulled up, partially covering her face. She had been struck in the head approximately 8 to 15 times, suffering 10 "significant" injuries.

Kitsap County sheriff deputies investigated the murder scene and determined that a trail of blood was splattered from the main trail, down the footpath about 148 feet to where the body was found. They found a 2.2-pound rock that had blue fibers crushed into it. The fibers matched the fibers in the victim's sweatshirt. The rock also had red spots on it that appeared to be blood. The rock was believed to be the murder weapon.

The autopsy showed that the victim had been killed by one of the blows to her head. The results of the autopsy could not show the order in which the blows were received or which blow actually killed the victim. The autopsy did not conclusively show that the young victim had been raped.

During the autopsy several loose hairs were removed from the victim's body. An examination of the hairs showed that most of them were consistent with the victim's own hairs.

Two of the hair fragments were recovered from her T-shirt and were Negroid hairs. A coarse brown hair, believed to be a pubic hair from a Caucasian, was found on the victim's left thigh and a red pigmented hair was found on one of her shoes. The Negroid hair was later determined to be genetically consistent with the Defendant's brother's arm hair. Defendant's brother was not in Kitsap County at the time of the murder. Evidence was produced to show that the Defendant, who lived with his brother's family, wore his brother's clothes on occasion. There was no identification connected with the Caucasian hair.

The investigation eventually focused on the Defendant. A search of his residence was conducted and clothing samples, including a pair of shoes, were seized. Examination of the shoes indicated that blood had been wiped from the shoes. Spots of blood were found on the shoelaces and those bloodstains were the subject of a number of scientific tests. These included ABO, gamma marker (GM), haptoglobin (Hp), DQ-alpha polymerase chain reaction DNA (PCR DNA), and phosphoglucomutase (PGM) testing. According to the State's experts, none of the tests performed on the bloodstains on Defendant's shoelaces eliminated the victim as the source of the blood. Since ABO, GM, haptoglobin and PCR DNA are genetically independent factors, the product rule[1] was used to obtain a cumulative frequency showing the percentage of the population from which the blood found on the Defendant's shoelaces could have originated. (The PGM test was determined not to be definite enough to factor into the final statistical probability.) On the ABO test, one of the bloodstains was type O and the victim had type O blood. Type O blood is found in 44.5 percent of the Caucasian population. The GM testing showed that both of the shoelace bloodstains were type 1,2,3,11 and victim also had type 1,2,3,11. This type is found in 14 percent of the Caucasian population. The hap-

---

[1]The testimony at trial was that the "product rule" allows one to multiply individual frequencies together to obtain a cumulative frequency for various factors that are determined to be statistically independent of one another. *See State v. Cauthron*, 120 Wn.2d 879, 901, 846 P.2d 502 (1993).

toglobin test showed one of the bloodstains on the shoelace to be Hp type "2" and the victim had type "2". Hp type "2" is found in 36.1 percent of the Caucasian population. There was expert testimony that the number of individuals having ABO type O and GM type 1,2,3,11 and Hp type 2 would be 2.25 percent of Caucasians. The PCR DNA testing on the bloodstains on both shoelaces showed a PCR type of 1.2, 3 and the victim's type was also 1.2, 3. The frequency of occurrence of type 1.2, 3 is approximately 8 percent in both the Caucasian and African American populations. The forensic scientist who performed the PCR DNA testing testified that the percentage of the Caucasian population that would have type O blood with GM 1,2,3,11 and Hp type 2 and PCR DNA of 1.2, 3 would be .18 percent. PCR testing was also conducted on a hair found in the victim's T-shirt, which yielded a PCR type of 1.2, 1.2, which is not the same as the Defendant's type, but does match his brother's type.

A *Frye*[2] hearing was conducted over the course of 6 weeks. The trial court concluded that the scientific evidence was reliable and should be admitted.

Other evidence linking Defendant to the murder included the testimony of three persons who reported seeing a man matching Defendant's description near the place of the murder and around the time of the murder, and three former jailmates of the Defendant who testified that the Defendant admitted to them he had killed someone. The testimony of these witnesses was essentially as follows.

Witness E.S. and her daughter K.T. testified that they had seen an African American man walking past E.S.'s home toward Rolling Hills Golf Course between 4 p.m. and 7 p.m. on June 13, 1988. The man was wearing a cap, a sports jacket and slacks. His clothing was described as scruffy and of a light color. E.S. later identified the individual as the Defendant, Jonathan Gentry. At the time of the murder, the Defendant was residing in the home of his brother and sis-

---

[2]Frye v. United States, 293 F. 1013, 1014, 34 A.L.R. 145 (D.C. Cir. 1923); *State v. Cauthron, supra.*

ter-in-law a short distance from E.S.'s home and the Rolling Hills Golf Course.

Witness F.B. was a bicyclist who had ridden the trails in the wooded area near Rolling Hills Golf Course a number of times. On June 13, 1988, the day of the homicide, he and a friend went to the area after work and rode the main trail from Riddell Road, south of the golf course, to the golf course and back. F.B. then traveled from Riddell Road, along the main trail to McWilliams Road. During this last time across the path, at approximately 5:30 p.m., he saw an African American man standing just off the main trail. F.B.'s description of the man was consistent with that given by E.S.

Witness B.D. had been incarcerated in the Kitsap County Jail with the Defendant in the summer of 1988. He testified that he and the Defendant were playing cards when detectives arrived to take samples of Defendant's hair in connection with the investigation of the victim's murder. B.D. testified that when the Defendant returned to the card game, Defendant said, "They found my hair on the bitch." When B.D. asked the Defendant whether he had killed the young girl, he said that he had but that they could not prove it.

Witness T.H. had been incarcerated with the Defendant at the Washington State Correctional Center at Shelton in December 1989 and January 1990. He testified that the Defendant told him that he had killed a 10-year-old girl who lived across the street from his brother's house because he thought she was leading him on. This statement was made, according to T.H., during a card game and others, including inmate L.S., were present.

L.S. testified that the Defendant told him that he had killed his girlfriend and disposed of her body.

The jury found the Defendant guilty of premeditated first degree murder and of felony murder. The jury additionally found that the murder was committed to conceal the identity of a person committing a crime, thus finding an aggravating circumstance which subjected Defendant to the possibility of a death sentence.

Shortly before the penalty phase of the proceeding began, the United States Supreme Court issued its ruling in *Payne*

*v. Tennessee*, 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991), holding that the admission of a victim impact statement into the penalty phase of a capital murder case was not per se unconstitutional. The trial judge in the present case determined that the victim's father could make a statement to the jury and that statement was considered in the jury's determination that there were not sufficient mitigating circumstances in the case to merit leniency. Defendant Jonathan Lee Gentry received a sentence of death.

Nineteen basic issues are presented by this appeal.

### GUILT PHASE ISSUES

ISSUE ONE. Is the polymerase chain reaction (PCR) method of testing DNA evidence in the forensic setting generally accepted in the relevant scientific community and were the results of the PCR tests properly admitted into evidence under Rule of Evidence 702?

ISSUE TWO. Were the gamma marker testing results properly admitted?

ISSUE THREE. Does the admission of the results of phosphoglucomutase (PGM) analysis violate ER 702?

ISSUE FOUR. Was sufficient evidence presented to support the jury's verdict that the murder was premeditated and that it was committed to conceal the identity of a person committing a crime?

ISSUE FIVE. Did the trial court err in denying the Defendant's pretrial motion to suppress evidence obtained during a search of Defendant's residence, his person and his personal effects?

ISSUE SIX. Did the trial court abuse its discretion in admitting photographic exhibits 47, 48, and 54?

ISSUE SEVEN. Did racism permeate the trial, necessitating a reversal of Defendant's conviction?

ISSUE EIGHT. Did jury instruction 10, the "to convict" instruction, properly inform the jury regarding what is required for conviction for the crime of murder in the first degree?

ISSUE NINE. Does counsel's and the trial court's mistake in designating an alternate juror as a participating juror prior to the jury's deliberations constitute reversible error?

ISSUE TEN. Are the issues raised by the State, relating to appointment of counsel prior to the filing of formal charges and to Defendant's right to protection during the investigative stage, moot?

### PENALTY PHASE ISSUES

ISSUES ELEVEN and TWELVE. Two related issues arise with regard to the victim impact evidence:

1. Whether the Constitution of the United States bars the introduction of the testimony by the father of the victim at the capital sentencing proceeding; and

2. Whether such testimony is barred by the Washington State Constitution.

ISSUE THIRTEEN. Did the trial court err in excusing two prospective jurors for cause after finding that the attitude of each prospective juror toward the death penalty would prevent or substantially impair that individual juror's ability to perform the duties of a juror?

ISSUE FOURTEEN. Did the introduction in the penalty phase of the trial of a judgment and sentence signed by the trial court judge regarding one of Defendant's prior crimes unfairly prejudice the Defendant or constitute an unconstitutional comment on the evidence?

ISSUE FIFTEEN. Did the State commit misconduct necessitating reversal of the death sentence during the prosecutor's closing arguments in the penalty phase of the case?

ISSUE SIXTEEN. Did the trial court err in defining mitigating circumstances in penalty phase jury instruction 5?

ISSUE SEVENTEEN. Did the trial court err in declining to give the State's proposed instruction regarding mitigating circumstances?

ISSUE EIGHTEEN. Is RCW 10.95.060(4) unconstitutionally vague?

ISSUE NINETEEN. Was the evidence sufficient to justify the jury's decision to impose the death penalty; was the sentence of death excessive or disproportionate to the penalty im-

posed in similar cases considering the crime and the Defendant; and was the sentence brought about through passion or prejudice?

DECISION

GUILT PHASE

ISSUE ONE.

CONCLUSION. The results of the DNA testing using the PCR method of analysis were properly admitted.

At the Defendant's trial, the State introduced results from ABO blood typing, a haptoglobin test, polymerase chain reaction tests (PCR), gamma marker (GM) and phosphoglucomutase (PGM) analysis.

On appeal the Defendant concedes the admissibility of the ABO and haptoglobin tests but argues: (1) PCR DNA testing violates prong two of the *Frye*[3] test and Washington law; (2) GM testing also does not pass prong two of *Frye*; and (3) the admission of PGM testing violates ER 702.

 We have recently discussed in detail the proper test and standard of review to be used in the courts of the State of Washington determining whether novel scientific evidence is admissible. That was in *State v. Cauthron*, 120 Wn.2d 879, 886, 846 P.2d 502 (1993), wherein we also renewed our adherence to the *Frye* standard:

> [E]vidence deriving from a scientific theory or principle is admissible only if that theory or principle has achieved general acceptance in the relevant scientific community.

*Cauthron*, 120 Wn.2d at 886 (quoting *Frye v. United States*, 293 F. 1013, 1014, 34 A.L.R. 145 (D.C. Cir. 1923) (hereinafter *Frye*).

In Washington, there are two prongs to the *Frye* test: (1) whether the scientific theory upon which the evidence is based is generally accepted in the relevant scientific community, and (2) whether the technique used to implement that theory is also generally accepted by that scientific community.[4] If there is a significant dispute between qualified

---

[3]*Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923).

[4]*State v. Cauthron*, 120 Wn.2d 879, 888-89, 846 P.2d 502 (1993).

experts as to the validity of the scientific evidence, either as to the theory or the implementing technique, it may not be admitted.[5] A third prong, which asks whether a generally accepted technique was performed correctly on a given occasion, is included in some states as part of the *Frye* test, but in Washington, prong three inquiries go to weight, not to admissibility.[6]

■ There is no question that the underlying scientific theory of DNA typing is accepted in the scientific community for identification purposes in the forensic setting.[7] However, in order to be admissible, *Frye* requires that both an accepted theory and a valid technique to implement that theory be generally accepted in the scientific community.[8] We have recently held that forensic DNA identification theory, and the restriction fragment length polymorphism (RFLP) technique in particular, are generally accepted in the relevant scientific communities of molecular biology and population genetics and therefore pass the *Frye* test.[9] The issue in this case is thus not whether the underlying *theory* of DNA testing is generally accepted, but whether the PCR *technique* is generally accepted.

■ PCR involves a method of DNA amplification in which a minute sample of DNA can be copied millions of times. For DNA typing, one amplifies a genetically informative sequence and detects the genotype in the amplified product.[10] In forensic analysis, the kit available for PCR analysis (the Cetus DQ-alpha kit) uses reverse dot hybridization to detect variation at

---

[5]*Cauthron*, 120 Wn.2d at 887.

[6]*Cauthron*, 120 Wn.2d at 889; *State v. Kalakosky*, 121 Wn.2d 525, 541, 852 P.2d 1064 (1993).

[7]*Cauthron*, 120 Wn.2d at 895; *Kalakosky*, 121 Wn.2d at 543. Nat'l Research Coun., *DNA Technology in Forensic Science* 133, 144-45 (1992) (hereinafter *NRC Report*).

[8]*Cauthron*, 120 Wn.2d at 889.

[9]*Kalakosky*, 121 Wn.2d at 543; *Cauthron*, 120 Wn.2d at 895, 911; *NRC Report*, at 133.

[10]*NRC Report*, at 40.

the HLA-DQ-alpha locus.[11] The Cetus DQ-alpha kit was the test used in this case and in *State v. Russell*, 125 Wn.2d 24, 882 P.2d 747 (1994), the other case involving PCR DNA testing heard by this court this term. We considered the admissibility of the PCR technique in *Russell* and it is now settled law in this state that the PCR technique of DNA analysis passes the *Frye* test and is admissible evidence in Washington.[12] We therefore conclude that both prongs of the *Frye* test are met; the theory of DNA identification is generally accepted[13] as is the PCR technique of implementing that theory.[14]

The Defendant also argues that even if PCR DNA analysis passes the *Frye* test, the particular testing in this case was unreliable and therefore the evidence should have been excluded under ER 702. We disagree.

■ Once a *Frye* determination is made, a defendant's objection to the particular testing procedures utilized in a given case should be analyzed under the usual standards for admission of evidence.[15] The admissibility of expert testimony is governed by ER 702:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to deter-

---

[11]*NRC Report*, at 68.

[12]In *State v. Russell*, 125 Wn.2d 24, 882 P.2d 747 (1994), the author of the present opinion dissented, stating the opinion that the PCR technique of DNA analysis is not yet generally accepted in the relevant scientific community for use on forensic evidence. However, those views were not accepted by a majority of this court and I am therefore bound by the doctrine of stare decisis to accede to the view of the majority on this issue.

All counsel herein are to be commended for the scholarly development of the record, the complete presentation of expert witnesses, and for the legal and factual arguments on this complex scientific issue.

Both the *Russell* case and the present case were argued to this court in the same term and most of the views expressed in the *Russell* opinions regarding DNA evidence are applicable to the present case. The parties in this case should be further advised that the record, the case law and the scientific and legal literature were painstakingly reviewed and discussed by all members of this court.

[13]*State v. Cauthron, supra; Kalakosky*, 121 Wn.2d at 543.

[14]*State v. Russell*, 125 Wn.2d 24, 882 P.2d 747 (1994).

[15]*Kalakosky*, 121 Wn.2d at 540; *Cauthron*, 120 Wn.2d at 889.

mine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

When the challenge to admissibility is to alleged errors in a given test, the determination of whether expert testimony is admissible is within the discretion of the trial court; unless there has been an abuse of discretion, this court will not disturb the trial court's decision.[16]

In this case, there was evidence that the testing was carefully performed by a knowledgeable scientist, monitored by a highly qualified defense expert, and was the subject of scrutiny by a number of qualified scientists. Dr. Edward T. Blake, a forensic serologist with a doctorate in criminology who has previously qualified as an expert in PCR DNA evidence in a number of states, performed the PCR tests in this case. He described in detail the PCR DQ-alpha test he used and the controls used to safeguard against laboratory error. He testified that the PCR technique can be used on much smaller and more degraded samples than one could work with when using the more widely used RFLP analysis. In his testimony, he also explained that Dr. George Sensabaugh had been retained by the defense to monitor the PCR work and that all data had been made available to him.

The criticisms of the test in this particular case, such as whether the proper procedures were carried out, whether the lab notes were adequate, whether the number of amplifications conformed to the laboratory protocol, are questions regarding whether this particular test was properly conducted and hence go to the issue of weight, not admissibility. They were therefore properly submitted to the jury. As we have previously explained, human error in the forensic laboratory will continue to be a relevant inquiry. However, the trial court is best suited to address such factual matters. Once PCR evidence is determined to be generally accepted, as it has been, then both proponents and opponents of a particular test should be able to garner the necessary infor-

---

[16]*Kalakosky*, 121 Wn.2d at 541; *Cauthron*, 120 Wn.2d at 890; *State v. Swan*, 114 Wn.2d 613, 655, 790 P.2d 610 (1990), *cert. denied*, 498 U.S. 1046 (1991).

mation to present both sides of the issue of whether errors were committed in a given test to the factfinder when there is a challenge to the validity of a laboratory procedure.[17] That is precisely what occurred in this case. The jury heard knowledgeable scientists for both the State and the defense testify at length on the issue of the validity of these particular tests. We find no error in the trial court's decision to allow the evidence concerning the PCR method of testing DNA to go to the jury.

ISSUE TWO.

CONCLUSION. The bloodstain analysis based on agglutination inhibition testing is generally accepted in the relevant scientific community as valid and reliable scientific technique and was properly admitted into evidence. "Gamma markers" are genetic variations of antibody molecules that can be tested serologically.

██ ██ In this case, the Defendant challenges the admissibility of the gamma marker test results based on prong two of the *Frye*[18] test. He concedes that the theory of gamma marker testing is generally accepted by scientists for the testing of crime scene evidence, but argues that the Washington State Patrol (Patrol) used a technique which is not generally accepted. Defendant argues that the only technique accepted in the scientific community for testing of gamma markers is the "V-bottom microplate" method used by Dr. Moses Schanfield.[19] We disagree and conclude that the gamma marker slide method used by the Patrol is generally accepted in the relevant scientific community. In a *Frye* analysis, we look to the record before us, the literature and the decisions from other jurisdictions.[20]

Mr. George Chan of the Washington State Patrol is the forensic scientist who conducted the ABO blood typing and the gamma marker testing on the Defendant's shoelaces and

---

[17]*Kalakosky*, 121 Wn.2d at 541-42. *See Cauthron*, 120 Wn.2d at 890.

[18]*Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923).

[19]Dr. Schanfield was the State's expert in this case on gamma marker testing.

[20]*Cauthron*, 120 Wn.2d at 888.

on the rock used as the murder weapon. He performed duplicate GM tests. He testified that the gamma marker testing refers to ,an agglutination inhibition test and that there are at least three methods to do this testing technique: the test tube method, the slide method, and the microtiter plate method. He said that all three variations involve essentially the same technology and he gave the example of a person preferring to eat from a bowl, a plate or a paper plate. Mr. Chan testified that all three methods of testing were generally accepted in the scientific community. He explained that the Patrol used the slide method taught by Brian Wraxall and that the Patrol lab had spent a year running proficiency tests before it used the test on forensic samples. Each technician was required to type at least 250 samples before the lab began using the test.

Moses S. Schanfield, Ph.D., Laboratory Director of Analytical Genetic Testing Center, Inc., specializing in forensic testing, testified that the gamma marker test methodology is similar to body fluid testing for ABO markers. He testified that gamma markers were discovered in 1956, used in forensic testing by 1961, and that, in Europe and worldwide, gamma marker testing has been used for almost 30 years. He testified that the published forensic literature probably consists of in excess of 100 articles and the standard method for detecting gamma markers in the blood, the "haem agglutination inhibition" or "absorption inhibition" test, is a very old test which is generally accepted for forensic use. Dr. Schanfield testified that there are different procedures for using the agglutination inhibition test which are all based on a "3-drop test". The various procedures include use of a test tube, several microplate methods and many slide methods. Dr. Schanfield testified that both the microplate and the slide method are generally accepted within the scientific community. Dr. Schanfield also testified that his technique (V-bottom microplate) was simply a miniaturization of the test tube procedure while the Wraxall slide method (used by the Washington State Patrol) was a miniaturization of the old slide method. Dr. Schanfield further testified that no one

of the methods is more or less accepted in the scientific community and that different methods are used worldwide. Dr. Schanfield's own testimony refutes the Defendant's contention that Dr. Schanfield's technique is the only accepted method to conduct the testing for gamma markers. The record and exhibits support the trial court's finding that Dr. Schanfield was a most knowledgeable witness regarding GM testing.

The defense brief distorts Dr. Schanfield's testimony. Defense counsel represented to this court that Dr. Schanfield agreed that the method used for gamma marker testing was not scientifically reliable. This is an inaccurate description of his testimony. The defense brief also indicates that Dr. Schanfield testified that Mr. Wraxall's slide method has never been published in a peer reviewed journal. More accurately, what Dr. Schanfield testified to is that he did not believe Wraxall's method was peer reviewed because once a methodology has been around for a long period of time it's very difficult, if not impossible, to have just a new variation published.

Mr. Brian Wraxall[21] is the director and a forensic serologist at the Serological Research Institute and the person who trained the Patrol's forensic lab personnel in gamma marker testing. He testified that gamma markers are very stable markers found in large concentrations in the blood and that GM testing has been used in forensics since the 1960's. He also testified there are three procedures for conducting the absorption inhibition test: the tube technique, the slide technique, and the microtiter technique. He further testified that all three techniques were generally accepted in the scientific community.

The defense offered no serious scientific opposition to the scientific opinions that gamma marker testing was well estab-

---

[21]Although Mr. Wraxall's educational background and credibility were questioned at the *Frye* hearing, the only test he conducted in this case was the haptoglobin test which is not challenged on appeal. There is apparently a vitriolic dispute between Mr. Wraxall and the defense expert, Dr. Grunbaum, which goes back a long time and appears irrelevant to the legal issues of the case. *See People v. Young*, 425 Mich. 470, 391 N.W.2d 270 (1986).

lished and had long been generally accepted in the relevant scientific community. Wilma Bodman Bias, Ph.D., Professor at the Department of Medicine at Johns Hopkins University School of Medicine, was the defense witness regarding GM testing. She testified that GM typing done in research or clinical labs is generally accepted in the scientific community. She also agreed that GM testing had been done since the early 1960's. When asked whether she could comment on whether the techniques used for GM testing in crime laboratories were generally accepted in the scientific community, she stated she could not comment as the literature that she had read did not cover the forensic area so she did not know. She stated that she had known Dr. Schanfield for 20 years and that she would defer to his judgment regarding how to conduct GM tests on crime scene evidence.

Dr. Bias did criticize Dr. Chan's notes on the GM test and the adequacy of the protocol manual. However, as noted above, criticism of how a particular test is conducted in a given case is an issue which generally goes to the weight, not to the admissibility, of scientific evidence.

No cases have been cited or located which hold that GM testing is lacking in general acceptance. A number of cases discuss gamma marker evidence without specifically discussing its admissibility.[22] The California Supreme Court has held that gamma marker testing, and the particular technique used in this case, do pass the *Frye* test. *People v. Yorba,* 209 Cal. App. 3d 1017, 257 Cal. Rptr. 641 (1989). The *Yorba* court described the expert testimony and concluded that GM testing is generally accepted in the scientific community. The court stated:

> Neither party cites, and our independent research has not revealed, any published authority concerning the admissibility of forensic agglutination inhibition evidence. Nevertheless, the uncontradicted testimony established the test has been performed by scientists around the globe for many years with a

---

[22]*Commonwealth v. Phoenix,* 409 Mass. 408, 420-21, 567 N.E.2d 193, 200 (1991) (the testimony of Dr. Schanfield that GM testing is generally accepted in the scientific community and used in over 11 countries was unrefuted); *People v. Schulz,* 154 Ill. App. 3d 358, 506 N.E.2d 1343 (1987).

high degree of accuracy. Consequently, the record supports the trial court's conclusion that the scientific community accepts agglutination inhibition as a valid and reliable scientific technique.

*Yorba*, 209 Cal. App. 3d at 1025.

The experts' testimony in the *Frye* hearing in the present case indicates that there is a large body of scientific literature regarding GM testing. No literature, medical or legal, has been cited which questions the validity of GM testing.

We conclude that the expert testimony in this case here supports the trial court's conclusion that the gamma marker theory, and the technique used in this case, are generally accepted in the scientific community. There is no indication in the expert testimony, the case law or the literature that there exists a serious debate among qualified scientists about the general acceptance of gamma marker testing. The only real challenge to the test was to the way this particular test was conducted, and such objections go to weight, not to admissibility. There has been no showing of an abuse of the trial court's discretion under ER 702.[23]

ISSUE THREE.

CONCLUSION. We find no abuse of the trial court's discretion in admitting PGM testing results.

There are tests to determine the phosphoglucomutase (PGM) type in blood samples. Dr. Blake conducted the PGM test in this case and got a "weak" result which he interpreted with caution. The PGM result was not factored into the probability statistics introduced to the jury, but was used only to show that the results of the test did not eliminate the victim as the person whose blood was on the Defendant's shoelaces.

■ The defense does not challenge the PGM test under a *Frye* analysis; it argues that the test results should have been excluded under ER 702. As noted above, the determination of whether expert testimony is admissible under ER 702 is within the discretion of the trial court; unless there

---

[23]*See State v. Cauthron*, 120 Wn.2d 879, 889-90, 846 P.2d 502 (1993); *State v. Kalakosky*, 121 Wn.2d 525, 540-41, 852 P.2d 1064 (1993).

has been an abuse of discretion, this court will not disturb the trial court's decision.[24]

The defense argues that "isoelectric focusing" is the manner PGM testing is done now instead of by the conventional method. The defense brief states that Dr. Schanfield testified that the preferred method to type PGM is isoelectric focusing. In fact, what Dr. Schanfield testified to is that isoelectric focusing is more sensitive, but he also testified that conventional subtyping is primarily used in crime labs, and that both are used and that both can detect the subtypes.

The defense brief also states that Dr. Schanfield testified that the PGM result was uninterpretable and inconclusive. In fact, he testified that he probably would have reached the same result as Dr. Blake (the forensic scientist who conducted the test), but that he was unable to reach a result looking at the photograph alone. He specifically denied he had said his laboratory would have called the result an uninterpreted or inconclusive result.

The defense also relies on the testimony of defense expert Dr. Bakken, who criticized the manner in which Dr. Blake conducted the PGM test. Again, as we explained in *Cauthron* and in *Kalakosky*, alleged infirmities in the performance of a test usually go to the weight of the evidence, not to its admissibility.[25] In this case, the defense expert had never conducted a PGM test. Mr. Chan of the Washington State Patrol testified that he had been conducting PGM tests for 10 years and that he had reviewed Dr. Blake's PGM test results and would probably come to the same conclusion. Dr. Blake, who performed the PGM test in this case, had conducted thousands of PGM tests and explained that it was one of the standard conventional genetic marker tests done in all crime labs that do serological examinations.

From our review of the record, we conclude that the trial court did not abuse its discretion in admitting the results of the PGM test.

[24]*Kalakosky*, 121 Wn.2d at 541 (citing *Cauthron*, 120 Wn.2d at 890).

[25]*See also State v. Lord*, 117 Wn.2d 829, 822 P.2d 177 (1991), *cert. denied*, 121 L. Ed. 2d 112 (1992).

In his pro se brief, the Defendant argues that the burden of proof was unconstitutionally shifted when the prosecuting attorney asked defense expert witnesses whether they had retested or conducted tests on the forensic samples. When this issue arose at trial, the trial court ruled that the State's questions regarding whether the various experts had tested the evidence were permissible, but questions whether they could have conducted tests were improper. The trial court therefore gave a curative instruction regarding the burden of proof. The trial court told the jury:

> I have sustained an objection to the State's last question. You are instructed to disregard it. Every Defendant in a criminal case is presumed to be innocent. This presumption continues throughout the entire trial, unless you find during your deliberations that it has been overcome by the evidence beyond a reasonable doubt. The State as plaintiff has the burden of proving each element of the crime beyond a reasonable doubt. The defendant has no burden of proving a reasonable doubt exists, and no burden to produce any evidence.[26]

Any possible implication that the Defendant had the burden of proof was corrected by this instruction regarding the presumption of innocence and the State's burden of proof. While it is questionable whether asking scientific experts whether they did, or could have, conducted duplicate testing is error at all,[27] in this case any possible error in confusing the jury as to the burden of proof was cured by the trial court's simultaneous curative instructions.[28]

■ The prosecuting attorney made a brief comment in closing that "[t]he hypothesis of the defense's consultants is, destroy the evidence, the scientific evidence of the state. And we can do that by making assumptions, by never calling

---

[26]74 Report of Proceedings (June 20, 1991), at 26.

[27]*State v. Jobe*, 486 N.W.2d 407, 418 (Minn. 1992); *State v. Blair*, 117 Wn.2d 479, 491, 816 P.2d 718 (1991); *State ex rel. McDougall v. Corcoran*, 153 Ariz. 157, 160, 735 P.2d 767, 770 (1987); *see State v. Bebb*, 44 Wn. App. 803, 723 P.2d 512 (1986), *aff'd*, 108 Wn.2d 515, 740 P.2d 829 (1987).

[28]*See Commonwealth v. Viriyahiranpaiboon*, 412 Mass. 224, 231-32, 588 N.E.2d 643, 649-50 (1992).

anybody, never doing any tests in this case."[29] No contemporaneous objection was made. When the defense subsequently made a motion for a mistrial based on this comment, the trial court offered to again give a cautionary instruction to the jury, but that offer was refused by the defense. Where improper argument is claimed, the defense bears the burden of establishing the impropriety of the prosecuting attorney's comments as well as their prejudicial effect. Reversal is not required if the error could have been obviated by a curative instruction, which the defense did not request. The failure to object to a prosecuting attorney's improper remark constitutes a waiver of such error unless the remark is deemed to be so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury.[30] The defense here has neither satisfied the burden of showing the impropriety of the comment or any resulting prejudice. In light of the repeated correct instructions regarding the State's burden of proof, no prejudice has been shown.

In summary, we conclude that the PCR DNA testing results were properly admitted pursuant to the majority opinion in *State v. Russell*, 125 Wn.2d 24, 882 P.2d 747 (1994) and ER 702. Gamma marker testing, and the technique used in this case, are generally accepted in the scientific community and meet the *Frye* standard for admissibility in Washington and there is no violation of ER 702. The phosphoglucomutase (PGM) analysis was properly admitted under ER 702.

ISSUE FOUR.

CONCLUSION. Sufficient evidence exists to support the jury's determination that the murder of the young victim was premeditated and that it was committed to conceal the identity of the person committing the crime.

 The standard for reviewing the sufficiency of evidence in a criminal case is well settled. That standard is whether, after viewing the evidence in the light most favorable to the

---

[29]77 Report of Proceedings, at 5426.

[30]*State v. Hoffman*, 116 Wn.2d 51, 93, 804 P.2d 577 (1991).

prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt.[31]

When a defendant challenges the sufficiency of the evidence, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant.[32] Further, a defendant who claims insufficiency admits the truth of the State's evidence and all inferences that can reasonably be drawn from that evidence.[33]

This standard applies to determine whether circumstantial evidence of premeditation is sufficient,[34] and applies to determine whether circumstantial evidence is sufficient to support a jury's determination that an aggravating factor is present.[35]

The only element of first degree murder challenged by Defendant on sufficiency grounds is that of premeditation.

The statute defining first degree murder provides:

(1) A person is guilty of murder in the first degree when:

(a) With a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person; . . . [.]

RCW 9A.32.030(1)(a) (part).

Premeditation "must involve more than a moment in point of time". RCW 9A.32.020(1). It has been defined as "the deliberate formation of and reflection upon the intent to take a human life."[36] It has further been held to involve "the

---

[31]*State v. Ortiz*, 119 Wn.2d 294, 311-12, 831 P.2d 1060 (1992); *State v. Lord*, 117 Wn.2d 829, 822 P.2d 177 (1991), *cert. denied*, 121 L. Ed. 2d 112 (1992); *Hoffman*, 116 Wn.2d at 82; *State v. Jeffries*, 105 Wn.2d 398, 407, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986); *State v. Green*, 94 Wn.2d 216, 616 P.2d 628 (1980); *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979).

[32]*State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992); *State v. Ashcroft*, 71 Wn. App. 444, 454, 859 P.2d 60 (1993).

[33]*Salinas*, 119 Wn.2d at 201; *Ashcroft*, 71 Wn. App. at 454.

[34]*State v. Ortiz*, 119 Wn.2d at 312-13; *Hoffman*, 116 Wn.2d at 83.

[35]*Jeffries*, 105 Wn.2d at 407-08.

[36]*State v. Robtoy*, 98 Wn.2d 30, 43, 653 P.2d 284 (1982); *Ortiz*, 119 Wn.2d at 312.

mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short."[37]

██ Premeditation may be proved by circumstantial evidence where the inferences drawn by the jury are reasonable and the evidence supporting the jury's finding is substantial.[38] A number of appellate cases have considered the sufficiency of evidence with respect to premeditation and demonstrate that a wide range of proven facts will support an inference of premeditation. For example, *State v. Rehak*, 67 Wn. App. 157, 834 P.2d 651 (1992) held that evidence showing the victim was shot three times in the head, two times after he had fallen on the floor, was sufficient to establish premeditation. *State v. Massey*, 60 Wn. App. 131, 803 P.2d 340 (1990), *cert. denied*, 499 U.S. 960 (1991) held evidence that defendant brought a gun to the murder site supported finding of premeditation. *State v. Woldegiorgis*, 53 Wn. App. 92, 765 P.2d 920 (1988), *review denied*, 112 Wn.2d 1012 (1989) held that evidence supported a finding of premeditation where the victim had gone to bed prior to the attack, was stabbed multiple times, had defensive wounds and there was longstanding animosity between the victim and defendant. *State v. Longworth*, 52 Wn. App. 453, 761 P.2d 67 (1988), *review denied*, 112 Wn.2d 1006 (1989) held evidence that a weapon had been procured, and that the victim was stabbed in the back while being held by another and was killed to keep her from reporting a burglary was sufficient to support a finding of premeditation. *State v. Gibson*, 47 Wn. App. 309, 734 P.2d 32 (1987) held evidence that there was a sufficient lapse of time between beating and strangling the victim was sufficient to support finding of premeditation. *State v. Bushey*, 46 Wn. App. 579, 731 P.2d 553 (1987) held that evidence that the victim had been strangled, that she had received blunt

---

[37]*State v. Ollens*, 107 Wn.2d 848, 850, 733 P.2d 984 (1987) (quoting *State v. Brooks*, 97 Wn.2d 873, 876, 651 P.2d 217 (1982)). *See also Ortiz*, 119 Wn.2d at 312.

[38]*Hoffman*, 116 Wn.2d at 83; *State v. Rehak*, 67 Wn. App. 157, 164, 834 P.2d 651 (1992).

injuries to her face, and that her hands had been tied was sufficient to support finding of premeditation. *State v. Giffing*, 45 Wn. App. 369, 725 P.2d 445 (1986) held that evidence the victim was transported some distance to an isolated spot and killed, when the attacker approached her from behind and slit her throat after stabilizing her, supported a finding of premeditation. *State v. Sargent*, 40 Wn. App. 340, 698 P.2d 598 (1985) held evidence that victim was struck by two blows to the head, with some interval passing between the blows, while she was lying face down, supported a finding of premeditation.

This court has held that evidence of strangulation, alone, does not support an inference of premeditation.[39] However, sufficient evidence to infer premeditation has been found where (1) multiple wounds were inflicted; (2) a weapon was used; (3) the victim was struck from behind; and (4) there was evidence of a motive, such as robbery or sexual assault.[40] Sufficient evidence to infer premeditation also has been found where multiple wounds were inflicted by a knife procured at the site of the killing, the killing took place in a room away from the kitchen, where the knife was found, where the victim was struck in the face and where the evidence indicated that the victim had engaged in a prolonged struggle.[41]

The facts of the present case, viewed in the light most favorable to the prosecution, show the following.

When she was attacked, the young victim was on a trail that led through a wooded area next to the Rolling Hills Golf Course. The site of the attack was heavily wooded and thick with underbrush. The area is dark, even in daylight, and part of the trail was almost like a tunnel because of overhanging foliage. Traffic on the trail was usually light, and the Defendant, whose main form of transportation was walking, was at least generally familiar with the area.

[39]*State v. Bingham*, 105 Wn.2d 820, 826, 719 P.2d 109 (1986).

[40]*State v. Ollens*, 107 Wn.2d at 853.

[41]*Ortiz*, 119 Wn.2d at 312-13.

The evidence indicated that the struggle between the victim and her attacker began on the main trail through the wooded area, where the young victim had evidently been picking flowers, and ended at the bottom of a connecting footpath, 148 feet from the main trail. Her body was found behind a very large log. Her sweatshirt had been pulled up, partially over her head, and her T-shirt had been pulled up to the middle of the breast area. Her jeans and underpants had been pulled down around her thighs.

The flowers the young girl apparently had picked and her glasses were found near the point where the attack began. At some point the Defendant apparently picked up the murder weapon — a large rock. The rock could have been picked up in an area on the trail just north of where the victim's glasses were found. The rock, which weighed 2.2 pounds, was found at the base of a maple tree, several yards from the main trail. It looked "out of place" where it was found. The rock was used to strike the child on her face and head between 8 and 15 times, possibly more. The attack on the victim continued down a foot trail, just off of the main trail. Luminol, a chemical solution used to find blood or define the extent of blood at crime scenes, was sprayed in the area. The luminol showed a substance believed to be blood that was splattered in varying quantities down some 148 feet of the foot trail. During the struggle, the victim's earring was torn from her ear. She apparently fought her attacker, who inflicted approximately 10 "significant" injuries. Two of the head injuries were serious enough to cause death by themselves. One of these was struck after the victim's sweatshirt had been pulled up over her face. The final blow could well have been made after she had been placed behind the large log where her body was eventually found. A depression in the soil under her head was 2 to 3 inches deep "like a significant force had been applied to her head to push it down into the soil". Blood from the victim's wounds had seeped into the ground to a depth of 10 inches. A long stick appeared to have broken beneath her head in that spot, and the stick, which was partly against the log, had a hand- or fingerprint on it

that was not readable but that could have been made by the victim. It also appeared that the decedent was the victim of an attempted sexual assault.

In sum, from the evidence presented a rational trier of fact could well conclude that the killer of this child had deliberately picked up a large rock to use against his victim; that he had the opportunity during continuous blows over 148 feet of trail to deliberately form and reflect upon the intent to take the life of the victim; that the victim struggled against her attacker; that blows were struck to both her face and the back of her head; that the final blow was inflicted upon her forehead while her head was covered with her shirt and that it was inflicted at the place where her body was found; and that she was the victim, as well, of an attempted sexual assault.

We hold that there was substantial evidence before the jury from which a rational trier of fact could determine beyond a reasonable doubt that the killing of the victim was premeditated.

A premeditated first degree murder can subject a defendant to the possibility of the death penalty if it is accompanied by 1 or more of 10 aggravating circumstances set forth in RCW 10.95.020. One of those factors is that the murder was committed to protect or conceal the identity of any person committing a crime.[42]

The jury found that the murder of the young girl in the present case was committed to protect or conceal the identity of a person committing a crime.

The Defendant argues that in order to meet constitutional requirements the aggravating factor must be applied in a manner that narrows the class of persons subject to the death penalty. With respect to this argument, the Defendant urges this court to interpret the aggravated murder statute so as to require a jury to find a number of elements before determining that the aggravating factor involved here was present. We reject Defendant's argument in this regard.

---

[42]RCW 10.95.020(7).

The constitutionality of the aggravating factors contained in the statute was discussed in *State v. Bartholomew*, 101 Wn.2d 631, 634-35, 683 P.2d 1079 (1984), in light of the United States Supreme Court decision in *Zant v. Stephens*, 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983). In *Bartholomew*, we held:

> In its decision affirming the Georgia court, the Supreme Court clarified the constitutional requirements that statutory aggravating factors must meet:
>
>> [A]n aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.
>
> (Footnote omitted.) 103 S. Ct. at 2742-43. *Aggravating factors serve such a narrowing function under the Washington statutory scheme.* The Washington capital punishment statute differs from the Georgia statute considered in *Zant v. Stephens* in that the Washington scheme requires the consideration of aggravating factors at the guilt determination phase, rather than at the sentencing phase as required by the Georgia statute. Under the Washington statute, of that class of persons guilty of first degree murder, the jury may consider the death penalty only if one of the aggravating circumstances set forth in RCW 10.95.020 is also found to exist. This genuinely narrows the class of persons subject to the death penalty as constitutionally required.

(Italics ours.) *Bartholomew*, 101 Wn.2d at 635.

The statute sets forth the aggravating circumstance found here as follows:

> The person committed the murder to conceal the commission of a crime or to protect or conceal the identity of any person committing a crime[.]

RCW 10.95.020(7).

 This aggravating factor is narrowed by the language of the statute itself to require that the *purpose* of the killing be to conceal identity.

 The statute further requires that where this aggravating factor is found, the predicate crime must be distinct from the murder. This court has previously held that the crime which motivates the killing to conceal identity cannot be the murder itself, but the predicate crime need not be

identified by the jury.[43] Here the underlying crime was not specifically identified. However, it was clear that under the evidence presented, the jury could well have found the underlying crime was sexual assault or attempted sexual assault.[44]

Thus the correct standard is to require the jury to follow the statutory language and find that the murder was committed for the *purpose* of concealing the identity of a person who committed a *crime* and that the underlying crime was not the murder.

Defendant argues that the evidence before the jury in the present case did not support the jury's finding that the murder was committed to conceal the identity of a person committing a crime. In determining whether sufficient evidence was presented to support the jury's verdict, we again determine whether, viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found that the premeditated murder was committed for the purpose of concealing the identity of a person committing a crime.

Viewed in a light most favorable to the prosecution, the facts relating to this issue are that the young victim was the victim of an attempted rape. She was struck in the head numerous times with a heavy rock, and at least one time on the forehead after her shirt had been pulled over her face. She also was struck in the face and in the back of her head. The jury could well have found that the final blow was struck at the place where her body was eventually found, and as she lay behind a very large log, in dense underbrush, with her sweatshirt pulled over her head. From these facts we conclude that there was substantial evidence from which a rational trier of

---

[43]*State v. Jeffries*, 105 Wn.2d 398, 419-20, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986).

[44]The jury found that the murder was not committed in the course of, in furtherance of, or in immediate flight from the crime of rape in the first degree or second degree, but did find the Defendant guilty of felony murder, as well as premeditated murder. The jury had been instructed that in order to convict the Defendant of felony murder, the jury must find the Defendant was committing *or attempting* to commit rape in the first degree or second degree.

fact could conclude beyond a reasonable doubt that the purpose of the murder was to conceal the identity of the person committing an attempted sexual assault.

ISSUE FIVE.

CONCLUSION. The trial court did not err in denying Defendant's motion to suppress evidence obtained pursuant to three valid search warrants.

In his pro se brief, the Defendant argues that the trial court erred when it denied his motion to suppress evidence obtained pursuant to three search warrants. The evidence seized included the bloodstained shoes and laces that scientifically linked the Defendant to the murder and further included statements made by the Defendant to police while the warrants were being executed.

Defendant claims the detective making the sworn complaint in support of the search warrants intentionally or recklessly made misstatements of material facts and intentionally or recklessly omitted material facts from the complaint. He argues that the detective requesting the warrants improperly set forth the statements of two witnesses who reported seeing a man resembling Defendant within a mile of the murder on the afternoon and/or evening of the murder. According to the Defendant, the detective intentionally or recklessly made the two witnesses' statements more similar than they actually were. Further, he claims the detective omitted certain statements or events from the complaint.

In order to prevail on this issue, the Defendant must prove that any misstatements or omissions (1) were intentionally or recklessly made and (2) were material, that is, they were *necessary* to the finding of probable cause.[45] Thus, even if the Defendant were able to prove an intentional or reckless misstatement or omission, he still would be required to show that probable cause to issue the warrant would not have been found had those false statements been deleted and the omissions included.

---

[45]*State v. Garrison*, 118 Wn.2d 870, 827 P.2d 1388 (1992); *State v. Herzog*, 73 Wn. App. 34, 54, 867 P.2d 648 (1994); *Franks v. Delaware*, 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978).

■ Following a 2-day evidentiary hearing on the defense motion to suppress, the trial court entered findings of fact and conclusions of law, ruling that the detective signing the complaint did not intentionally or recklessly make material misrepresentations.[46] The Defendant fails to challenge any of the findings of fact and they will thus be treated as verities on appeal.[47]

The motion judge found:

### I.

That Detective Wright was at all times truthful and made no misstatements in his sworn complaint in support of the search warrant issued on August 16, 1988 and at all other material times.

### II.

That Detective Wright was in no way reckless or untruthful in the information he provided in support of the search warrants issued in this cause.

. . . .

### V.

That the Court finds the lack of some notations and some reports and the lack of a statement made to composite artist Detective Brian Schoening with regard to a small billed cap does not rise to a sufficient level to find that Detective Wright fabricated the October 16, 1988 police report, lied in his sworn complaint in support of the search warrant on August 16, 1988, and perjured himself in open court while testifying at the pre-trial hearing. In order to conclude otherwise the Court would have to find that Detective Wagner and [witness A] each gave perjured testimony about the conversation regarding the small-billed cap, and that [witness A] further perjured himself when he related his later conversation with Detective Wright to confirm his remembrance of the small-billed cap on the black subject.

Clerk's Papers, at 2749-50.

Nothing in the Defendant's argument or in the record raises a challenge of any substance to the motion judge's findings. As we recently held, in reviewing findings of fact entered following a motion to suppress, we review only those facts to which error has been assigned. Where there is sub-

---

[46]Findings of Fact and Conclusions of Law, Clerk's Papers, at 2749.

[47]*State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994); *State v. Harris*, 106 Wn.2d 784, 790, 725 P.2d 975 (1986), *cert. denied*, 480 U.S. 940 (1987).

stantial evidence in the record to support properly challenged facts, those facts will be binding on appeal.[48]

In any event, even if the alleged misstatements were deleted and the alleged omissions added, the motion to suppress would fail if a reasonable magistrate could find that the information contained in the revised affidavit or complaint for search warrant supported a finding of probable cause.[49]

If the information in this case which is alleged to be inaccurate were deleted and the allegedly missing information added, the issuing court would still have had the following information before it in considering whether to issue the search warrants:

1. A 12-year-old girl was sexually assaulted and beaten to death on June 13, 1988, in the woods near the Rolling Hills Golf Course. There was a significant amount of blood at the murder scene. Two Negroid hairs were found on her shirt, which was pulled above her breasts. A Caucasian hair was found on her leg. There was no apparent explanation for the Negroid hairs on the Caucasian victim.

2. Two witnesses informed police that they had seen an African American man within a mile of where the victim's body was found on the day of the murder and near the approximate time of the murder. Both of the witnesses say the man they observed was African American; both described him as being approximately the same height; both described him as wearing long pants and a long-sleeved shirt or jacket; both described his clothing as being partly tan; both described him as having short hair and no facial hair; both described him as wearing a dark hat or cap with no bill or a small bill; both described him as walking. One of the witnesses was able to take police to the residence of the man she saw.

3. A resident at that home was the Defendant, Jonathan Gentry, a man who fit the description of the man seen by both witnesses. Defendant frequently wore a cap with a small bill and also had a tan sport coat and tan slacks.

---

[48]*Hill*, 123 Wn.2d at 647.

[49]*Garrison*, 118 Wn.2d at 873; *State v. Cord*, 103 Wn.2d 361, 693 P.2d 81 (1985).

4. At the time the search warrants were sought the Defendant was in jail awaiting trial on a charge of first degree rape. He was alleged to have raped a young girl at knifepoint in a garage in Bremerton. Defendant had previously served time for other crimes, including grand larceny, burglary and a first degree murder charge which ended with a manslaughter conviction.

To establish probable cause, the affidavit or complaint in support of the search warrant must set forth sufficient facts to lead a reasonable person to conclude that there is a probability that the defendant is involved in criminal activity.[50]

We hold that, even based on this revised statement of the grounds for the warrant, probable cause existed to issue the warrants.

Because we determine that probable cause to issue the warrants existed, we do not reach the Defendant's claim that the consent to search executed by his sister-in-law was invalid.

ISSUE SIX.

CONCLUSION: The trial court did not abuse its discretion by admitting the autopsy photographs which were relevant to the issues of premeditation and intent to kill.

During the guilt phase of the trial, the State introduced a number of autopsy photographs which showed the severity and number of the victim's head wounds. The trial court conducted a hearing outside the presence of the jury and entertained argument regarding which of the photographs were necessary to help demonstrate the testimony of the pathologist. The trial court admitted a number of the photographs and refused to admit a number of those objected to by the defense.

The defense argues that the admission of some of the photographs of the victim's head injuries taken at the autopsy was prejudicial and should have been excluded. Specifically, the defense argues that exhibits 47 and 48 were repetitive of

---

[50]*Cord*, 103 Wn.2d at 365-66.

exhibit 46. Exhibits 47 and 48 were closeup pictures of the different head injuries; it was easier to see the depth of the wounds in 47 and 48 than in 46. The prosecuting attorney argued to the trial court that exhibits 47 and 48 were necessary to demonstrate the depth and nature of the wounds caused by the blows and that such evidence was relevant to the highly contested issues of intent to kill and premeditation. At trial, the closeup photos were used by the pathologist to demonstrate which blows to the victim's head would have caused death and which would have only rendered her unconscious, and to demonstrate the depth of the injuries.

The defense also argues that exhibit 54 was unnecessary and prejudicial. That exhibit is a photograph of the skull after the skin was reflected and shows the fracturing which had occurred due to blows by a blunt instrument. The defense argues that a photo of the outside of the head or x ray or medical drawings could have been used instead of the photograph. The pathologist told the trial court that the x ray showed just the gross evidence of a massive skull fracture and that he could not demonstrate any of the small internal fractures using the x ray only. The pathologist used the photograph to demonstrate the fragmentation of the skull.

The prosecuting attorney argued to the trial court that the nature of the injuries showed by the photographs was an indication of the amount of force used and relevant to the disputed issue of intent to kill. The number of different injuries, caused by different blows, is also relevant to the issue of premeditation.

■ In *State v. Lord*, 117 Wn.2d 829, 822 P.2d 177 (1991), *cert. denied*, 121 L. Ed. 2d 112 (1992), we discussed the admissibility of autopsy photographs and explained:

> The admission of photographs is within the sound discretion of the trial court. *State v. Hoffman*, 116 Wn.2d 51, 88, 804 P.2d 577 (1991). Photographs have probative value where they are used to illustrate or explain the testimony of the pathologist performing the autopsy. *State v. Jones*, 95 Wn.2d 616, 628, 628 P.2d 472 (1981). Gruesome photographs are admissible if the trial court finds their probative value outweighs their prejudi-

cial effect. *Hoffman*, at 88; *State v. Harris*, 106 Wn.2d 784, 791, 725 P.2d 975 (1986), *cert. denied*, 480 U.S. 940 (1987).

*Lord*, 117 Wn.2d at 870-71.

Although the trial court refused to admit the most gruesome and inflammatory photographs, the admitted photographs were gruesome. However, they were also highly relevant to show the many different blows and the force used to inflict the various injuries. These facts were relevant to the contested issues of intent to kill and premeditation. The prosecution is allowed to present photographic evidence to prove every element of the crime charged and to rebut all defenses.[51] The balancing of probative value against prejudicial effect is left to the discretion of the trial court and is reviewed only for abuse of discretion.[52] We conclude that the trial court did not abuse its discretion in determining that the probative value outweighed the prejudicial effect of the photographs.

ISSUE SEVEN.

CONCLUSION. Racism did not permeate the proceedings so as to deny Defendant a fair trial and thus is not a ground for reversing the Defendant's aggravated first degree murder conviction.

The Defendant urges us to hold that racism so infected his trial that reversal of his conviction for aggravated first degree murder is mandated.

The Defendant argues that this court should reverse his conviction and sentence, on public policy grounds, in order to discourage both the appearance and reality of racial unfairness in the judicial system. Specifically, the Defendant contends that a racially offensive out-of-court remark by C. Danny Clem, Kitsap County Prosecuting Attorney, to the Defendant's African American trial attorney, and the prosecutor's subsequent explanation of that remark, requires reversal of the conviction in this case.

---

[51]*State v. Daniels*, 56 Wn. App. 646, 650, 784 P.2d 579 (1990); *State v. Crenshaw*, 98 Wn.2d 789, 806-07, 659 P.2d 488 (1983).

[52]*State v. Rupe*, 108 Wn.2d 734, 757, 743 P.2d 210 (1987), *cert. denied*, 486 U.S. 1061 (1988).

No authority is cited for Defendant's position that reversal of the conviction for aggravated first degree murder is required under these facts. We therefore need not, and we do not, reach this issue.[53]

By declining to examine this issue, we do not intend to convey any approval of the prosecutor's remarks. To the contrary, we agree with the trial court's finding that the racially offensive statement of the prosecutor was totally inappropriate and offensive.

However, there is no evidence that the remark prejudiced the Defendant's right to a fair trial in any way. It would be inappropriate for this court to show its disapproval of a prosecuting attorney's racially offensive out-of-court statement by reversing a Defendant's conviction or sentence where the fairness of the trial was not affected by the statement.

The Defendant next argues that he was deprived of a verdict free of racial influences due to the manner of the State's presentation of evidence that two Negroid hairs were found on the Caucasian victim's T-shirt and due to the examination of a jailhouse informant who was shown to have racist tendencies.

The record does not support the Defendant's allegation that the State created a vision of the victim living in an all-white world only to have it destroyed when she met a black person.

The identity of the Defendant as the victim's killer was based on circumstantial evidence. An African American man, resembling the Defendant, was observed near the crime scene at about the time of the murder. Four human hairs that did not belong to the victim were found on her body during the autopsy. Two were Negroid hairs that were genetically consistent with 6 percent of the African American population as well as with hair samples taken from the Defendant's brother. The Negroid hairs were found on the victim's T-shirt. The State asked a number of witnesses questions which would narrow the ways in which the Negroid hairs

---

[53]*State v. Lord*, 117 Wn.2d 829, 853, 822 P.2d 177 (1991), *cert. denied*, 121 L. Ed. 2d 112 (1992).

could have been placed on the T-shirt. As reflected in the record, the tone of the prosecuting attorney's questions was aimed at proving the identity of the Defendant as the murderer and not at prejudicing the jury against the Defendant because of his race. In order for the State to prove identity through the circumstantial evidence that it had, the State was compelled to focus on the physical characteristics of the killer of the victim and the similarity of those characteristics to those of the Defendant.

The jailhouse informant in question had told police that he and the Defendant were incarcerated at the Kitsap County Jail and were playing a "nigger" card game when the Defendant left the room to provide hair samples to police investigators. When he returned to the card game, the Defendant allegedly said, "They found my hairs on the bitch". During direct examination, the prosecuting attorney questioned the informant about his use of the word "nigger" and about his attitude toward African Americans. The State's questioning of the informant appears to have been a strategic attempt to soften the impact of apparent racist attitudes by bringing them out on direct examination, rather than waiting for defense counsel to expose them on cross examination. That is an accepted trial tactic. The questions do not appear to have been asked in order to evoke racial prejudices in the jury. The testimony of the informant is not challenged on appeal on relevancy grounds. If anything, the State's examination of this witness appears to have made him a less credible witness.

After thoroughly reviewing the entire record, we conclude that the Defendant was not denied a fair trial because of his race.[54]

██ Defendant additionally argues that statistics show that death sentences are not imposed in a racially neutral manner in the United States. He implies that, at some point, statistics may similarly show that death sentences are

---

[54]Defendant additionally argues that certain remarks of the prosecutor during closing argument in the penalty phase of the trial had racial overtones. This argument is addressed below.

not imposed in a racially neutral manner in the State of Washington. Defendant then states that he "reserves the right" to challenge this State's death penalty statute if statistical analysis supports such a challenge at some time in the future. The Defendant fails to factually or legally support his argument that racial bias exists in the imposition of death penalty sentences in Washington. Because of the inadequate briefing on this claim, we are unable to meaningfully respond to the Defendant's challenge. We will not address constitutional arguments unsupported by adequate briefing.[55] A related issue is, however, discussed below in the proportionality review section.

ISSUE EIGHT.

CONCLUSION. The trial court did not err in its instruction on murder in the first degree and properly informed the jury of the requirements for finding the Defendant guilty of the charged alternatives.

The trial court's instruction 10 states in part:

> To convict the defendant of the crime of Murder in the First Degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (Alternative A) Premeditated Murder in the First Degree
> [lists the elements of premeditated murder in the first degree]
> AND/OR
> (Alternative B) Felony Murder in the First Degree
> [lists the elements of felony murder in the first degree]
> If you find from the evidence that each of the elements in Alternative A and/or each of the elements in Alternative B, has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. All the elements of only one alternative need be proved beyond a reasonable doubt. You must unanimously agree as to which one or more of the alternatives, A or B, has been proved beyond a reasonable doubt.
> On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of the elements in Alternative A, and as to any one of the elements in Alternative B, then it will be your duty to return a verdict of not guilty.

Clerk's Papers, at 2488-89.

The defense argues that the last paragraph erroneously informed the jury that in order to acquit the Defendant of

---

[55]*State v. Hill*, 123 Wn.2d 641, 648, 870 P.2d 313 (1994).

*either alternative,* it must find reasonable doubt as to at least one element in alternative A and *one* element in alternative B. This is not what the instruction says. It states that to find the Defendant "not guilty", there must be reasonable doubt as to any one element in both alternatives. This is an accurate statement of the law. The instruction is clear and the challenged paragraph is identical to the language of the comparable jury instruction given in *State v. Lord,* 117 Wn.2d 829, 879, 822 P.2d 177 (1991), *cert. denied,* 121 L. Ed. 2d 112 (1992).

Additionally, another instruction addressed what the jury should do if it found the Defendant guilty of one, but not the other alternative. Court's instruction 22 stated in part:

> You must fill in the blank provided in Verdict Form A the word "guilty" or the words "not guilty" according to the decision you reach. You must also fill in the blank or blanks to indicate your decision regarding Alternatives A a[n]d B with the answer "yes" or "no". *For you to answer "yes" to any alternative, you must be unanimously convinced beyond a reasonable doubt as to each element of that alternative.*

(Italics ours.) Clerk's Papers, at 2501.

The Verdict Form A provided in part:

> We the jury, find the Defendant, JONATHAN LEE GENTRY,
> _____ of the crime of MURDER IN
> (Write in "Guilty" or "not Guilty")
> THE FIRST DEGREE as charged.
> The jurors found:
> Alternative A, Premeditated First Degree Murder_____
> (Write in "yes" or "no")
> Alternative B, Felony First Degree Murder_____
> (Write in "yes" or "no")

Clerk's Papers, at 2505.

On the verdict form, the jury found Defendant guilty and answered "yes" to both alternatives. Each instruction must be evaluated in the context of the instructions as a whole.[56] Any conceivable omission in instruction 10 was provided in the plain language in instruction 22.[57] We conclude that there was no error in these instructions.

---

[56]*State v. Benn,* 120 Wn.2d 631, 654-55, 845 P.2d 289, *cert. denied,* 126 L. Ed. 2d 331 (1993).

[57]*State v. Lord,* 117 Wn.2d 829, 878, 822 P.2d 177 (1991), *cert. denied,* 121 L. Ed. 2d 112 (1992); *State v. Mak,* 105 Wn.2d 692, 735, 718 P.2d 407, *cert. denied,*

614

Issue Nine.

Conclusion. The mistake of the trial court and counsel for both parties in replacing a regular juror with an alternate juror does not constitute reversible error.

The jury initially selected by the parties included 12 regular jurors and 3 alternate jurors. Prior to jury selection the trial court had randomly selected 3 of the 15 seats to be alternate jury seats. Each party had a total of 12 peremptory challenges against regular jurors and 1 peremptory challenge against each alternate seat. The Defendant exercised 10 of his 12 peremptory challenges against regular jurors. He exercised a peremptory challenge against the first alternate chair and the third alternate chair. He did not challenge the second alternate juror, Ms. "B", for cause and did not exercise a peremptory challenge against her.

On the day trial started one of the regular jurors informed the court that she had thought about the case over the weekend and had become convinced that she would not be able to impose the death penalty. She was then excused from the jury. The first alternate juror was selected by the court to replace the excused juror.

At the close of the guilt phase of the trial the court attempted to excuse the two remaining alternate jurors. The following exchange took place:

> The Court: Ladies and gentlemen, as I indicated to you at the beginning of this trial, we would pick, at that time, three of your number to be alternates, so if anybody got sick or couldn't proceed with the case, we wouldn't have to start over again and we wouldn't have a mistrial. And those numbers, or those seats were picked by lot.
>
> So at this time, I want to particularly thank the alternates that have been selected by lot, and announce them. And they are Mrs. ["B"] and Mrs. ["S"].
>
> And ladies, thank you very much. You have been our insurance policy and we appreciate that. I hope it's not too frustrating to you to think that you've sat through all this and won't be able to serve it.

479 U.S. 995 (1986), *sentence vacated on writ of habeas corpus sub nom. Mak v. Blodgett*, 754 F. Supp. 1490 (W.D. Wash. 1991), *aff'd*, 970 F.2d 614 (9th Cir. 1992), *cert. denied*, 113 S. Ct. 1363 (1993).

[The Prosecuting Attorney]: Your Honor, may we ask for a sidebar, please?

[Defense Counsel]: I think that we thought about the same thing at the same time.[58]

At an unreported sidebar, the trial court and the attorneys apparently erroneously agreed that the judge had made a mistake with respect to the naming of the alternates. In fact, the trial court had been correct. However, following the sidebar conference, the proceedings continued as follows:

THE COURT: As far as we can't [sic] figure, [the Prosecuting attorney] is right. Are you comfortable with that?

[Defense Counsel]: We are.

THE COURT: Then, evidently, I made a mistake and Ms. ["B"], you are not the alternate.

Mr. ["R"], you are.

First mistake I ever made, ladies and gentlemen.

And so, Mr. ["R"] and Ms. ["S"], I thank you . . .. [59]

During this entire exchange, the Defendant was present and the record does not indicate any disagreement on his part. He now claims that his federal and state constitutional rights to have his case decided by the particular jury of his choosing were violated by the inadvertent — albeit agreed upon — replacement of a regular juror by an alternate juror.

■ A Defendant in a criminal case has a right to be tried by an impartial, 12-person jury.[60] Selection of the jury panel is governed, in part, by CrR 6.3 and 6.4. A defendant has no right to be tried by a particular juror or by a particular jury.[61] In cases, like the one here, that are expected to take a considerable time, the trial judge "may direct the selection of one or more additional jurors . . . to be known as alternate jurors".[62]

---

[58]77 Report of Proceedings, at 5552-53.

[59]77 Report of Proceedings, at 5553-54.

[60]Const. art. 1, § 21; *State v. Stegall*, 124 Wn.2d 719, 881 P.2d 979 (1994).

[61]*Creech v. Aberdeen*, 44 Wash. 72, 74, 87 P. 44 (1906) (citing *State v. Straub*, 16 Wash. 111, 47 P. 227 (1896)).

[62]CrR 6.5.

Here three alternate jurors were selected. The Defendant participated in their selection and the entire panel, both regular jurors and alternates, was ultimately accepted by the Defendant. Thus his constitutional right to an impartial jury selected by him was not violated.

Replacement of a regular juror by an alternate is governed by CrR 6.5. Defendant did not challenge the trial court's compliance with CrR 6.5 at any time before appeal. Instead, counsel for the Defendant agreed to the final panel and, in fact, participated in the error that resulted in replacing a regular juror with an alternate.

■ Since the issue involved here is compliance with a procedural rule rather than a constitutional issue, it may not be raised for the first time on appeal.[63]

Further, the Defendant has shown no prejudice as a result of the trial court's and counsel's error.

Issue Ten.

Conclusion. No effective relief is available to the State regarding certain of its pretrial motions. The issues are therefore moot.

The State asks this court to address the issue of whether the trial court erred in granting the Defendant's pretrial motions for appointment of counsel and for injunctive relief. Defendant argues the issues raised by the State are moot; we agree.

Ordinarily, this court will not consider a question that is purely academic.[64] A case is moot if a court can no longer provide effective relief.[65]

Essentially the State asks us to answer questions that are no longer in controversy and to undo what the trial court accomplished some years ago. It is too late for an effective remedy in this case, and any expression of disapproval or

[63]State v. Coe, 109 Wn.2d 832, 842, 750 P.2d 208 (1988).

[64]Grays Harbor Paper Co. v. Grays Harbor Cy., 74 Wn.2d 70, 73, 442 P.2d 967 (1968).

[65]Washam v. Pierce Cy. Democratic Cent. Comm., 69 Wn. App. 453, 457, 849 P.2d 1229 (1993), review denied, 123 Wn.2d 1006 (1994).

approval of the action challenged would be "purely academic" and thus inappropriate.[66]

The issues are moot and we decline to consider them.

### PENALTY PHASE

ISSUES ELEVEN AND TWELVE.

CONCLUSION. We conclude that there is no federal or state per se constitutional bar to the introduction of victim impact evidence in the penalty phase of a capital case and that such evidence is admissible under Washington law. Specifically, in the case before us the testimony by the victim's father was properly admitted and did not violate the Defendant's due process rights.

Generally, the term "victim impact evidence" refers to evidence given by the victim of the crime, or the representative of the victim, which describes the victim or the effect of the crime on the victim and his or her family. Often such evidence is referred to as a "victim impact statement".

Shortly before the Defendant's special sentencing proceeding in this case commenced, the United States Supreme Court decided *Payne v. Tennessee*, 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991). *Payne* overruled prior federal law which had imposed a constitutional bar on the presentation of victim impact evidence at capital sentencing proceedings. Based on the *Payne* decision, and a 1989 victim's rights amendment to the Washington State Constitution, the trial court ruled that victim impact evidence could be admitted at the Defendant's special sentencing proceeding.

During that proceeding, the father of the victim was called to testify. He testified about the victim's interests, and her plans for the future. He discussed the effects of his young daughter's murder on his work, his emotions and his family. In closing arguments, the prosecuting attorney recalled much of this testimony in noting the lost opportunities of the victim and her family and how the crime had affected them. No evidence was admitted regarding the victim's family's

---

[66]*State v. Turner*, 98 Wn.2d 731, 733, 658 P.2d 658 (1983); *State v. Vidal*, 82 Wn.2d 74, 79, 508 P.2d 158 (1973).

opinions of the crime, of the Defendant or as to what they felt was the appropriate punishment. The Defendant argues that the trial court erred by allowing such testimony and argument during his sentencing proceeding.

Two related issues arise with regard to this victim impact evidence:

1. Whether the Constitution of the United States bars the introduction of the testimony by the father of the victim at the capital sentencing proceeding; and

2. Whether such testimony is barred by the Washington State Constitution.

We conclude that there is no federal or state *per se* constitutional bar to the introduction of victim impact evidence in the penalty phase of a capital case and that such evidence is admissible under Washington law. Specifically, in the case before us the testimony by the victim's father was properly admitted and did not violate the Defendant's due process rights.

In *Payne*, the United States Supreme Court held that the Eighth Amendment prohibition against cruel and unusual punishment does not bar the admission of victim impact evidence in the sentencing phase of a capital trial.[67] *Payne* imposes no *per se* constitutional bar, but leaves the individual states to decide whether to allow victim impact evidence in death penalty sentencing proceedings. In *Payne*, the Supreme Court overruled two of its earlier cases, *Booth v. Maryland*, 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529 (1987) and *South Carolina v. Gathers*, 490 U.S. 805, 104 L. Ed. 2d 876, 109 S. Ct. 2207 (1989), which had prohibited the use of such evidence in death penalty cases. In *Booth*, the Court considered the use of victim impact evidence in capital sentencing proceedings and had imposed an irrebuttable presumption of undue prejudice and irrelevance on such evidence, determining that the Eighth Amendment prohibits its introduction in all cases.[68]

---

[67]*Payne v. Tennessee*, 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991).

[68]*Booth v. Maryland*, 482 U.S. 496, 507 n.10, 96 L. Ed. 2d 440, 107 S. Ct. 2529 (1987) (the Court provided a caveat, however, that such evidence was admissible

Two years later, in *Gathers*, the Court extended this prohibition to prosecutorial argument in death sentencing hearings.[69] Then, more recently, in *Payne*, the Court overruled *Gathers* and most of *Booth*.[70] The Court held in *Payne* that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar.

While the Defendant herein does not argue that the victim impact statement made at his sentencing proceeding violates the Eighth Amendment, he does appear to argue that its admission violated his Fourteenth Amendment due process rights. Under *Payne*, when the introduction of such evidence is so unduly prejudicial that it leads to a fundamentally unfair trial, a defendant may still seek relief under the Fourteenth Amendment.[71]

In this case, however, the evidence which the victim's father presented, and which the prosecuting attorney reiterated in argument to the jury, was no more unfairly prejudicial or inflammatory than the evidence and argument which was introduced in the *Payne* case — and which the Court did not find to be fundamentally unfair.[72]

In *Payne*, the defendant had brutally stabbed a young mother and her two children, aged 2 and 3. The mother and daughter died from the stab wounds, but Nicholas, the 3-year-old boy, survived. Nicholas' grandmother was permitted to testify to the jury that

---

when it related directly to the circumstances of the crime). *See, e.g., State v. Rice*, 110 Wn.2d 577, 607-08, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910 (1989).

[69]*South Carolina v. Gathers*, 490 U.S. 805, 104 L. Ed. 2d 876, 109 S. Ct. 2207 (1989).

[70]The Court declined to discuss the propriety of victim and survivor statements of opinion about the crime, the criminal and the appropriate sentence. *Payne*, 501 U.S. at 830 n.2.

[71]*Payne*, 501 U.S. at 825.

[72]*Payne*, at 826. *See People v. Raley*, 2 Cal. 4th 870, 916, 830 P.2d 712, 8 Cal. Rptr. 2d 678, 708 (1992), *cert. denied*, 507 U.S. 945, 122 L. Ed. 2d 733, 113 S. Ct. 1352 (1993); *Evans v. State*, 333 Md. 660, 637 A.2d 117, 131-32 (1994); *McMillian v. State*, 594 So. 2d 1253, 1274 (Ala. Crim. App. 1991).

He cries for his mom. He doesn't seem to understand why she doesn't come home. And he cries for his sister Lacie. He comes to me many times during the week and asks me, Grandmama, do you miss my Lacie. And I tell him yes. He says, I'm worried about my Lacie.

*Payne,* at 814-15.

In argument, the prosecuting attorney in *Payne* referred to the continuing effects on Nicholas and the effects of the murders on other family members and the tragedy for the defendant's family. The Supreme Court did not find this victim impact statement, or the prosecuting attorney's argument based on it, to be unfairly prejudicial or inflammatory. In the present case, as well, we cannot say that the jury's hearing about the victim's interests and expectations or about her father's natural feelings of grief deprived the defendant of due process. In fact, as the Court in *Payne* explained, it accepted review in order to determine if victim impact evidence relating to the "personal characteristics of the victim" and the "emotional impact of the crimes on the victim's family" was admissible at a capital sentencing proceeding.[73] This was exactly the kind of evidence which was admitted herein, and in a relatively abbreviated way.

■ The Defendant herein also argues that he was denied due process because he was not notified earlier in the trial that the prosecution intended to use victim impact evidence at his sentencing. The record reflects, however, that defense counsel was aware during trial that the United States Supreme Court was reconsidering the victim impact issue in the *Payne* case. The prosecution informed the defense the same day *Payne* was decided that it intended to offer victim impact testimony at the sentencing proceeding. Defense counsel was allowed to interview the victim's father prior to his testimony. The trial court's denial of a continuance based on alleged surprise does not merit exclusion of the evidence, especially since any possibility of prejudice from the failure to delay sentencing is remote in this case.[74]

[73]*Payne,* at 817.

[74]*See State v. Gould,* 58 Wn. App. 175, 181-82, 791 P.2d 569 (1990).

In light of the United States Supreme Court's decision in *Payne*, we conclude that the Defendant's federal constitutional rights were not violated by the introduction of victim impact evidence.

The Defendant herein also argues that the Washington State Constitution article 1, section 3 (due process) and section 14 (cruel punishment) bar the use of victim impact evidence in capital cases in this state. The Defendant relies on prior case law from this court which limits what is constitutionally admissible at death penalty sentencing proceedings, specifically, *State v. Bartholomew*, 98 Wn.2d 173, 654 P.2d 1170 (1982) (*Bartholomew* I), *State's cert. granted and remanded*, 463 U.S. 1203, *defendant's cert. denied*, 463 U.S. 1212 (1983), *adhered to on remand*, 101 Wn.2d 631, 683 P.2d 1079 (1984) (*Bartholomew* II).

Capital punishment proceedings are regulated in the State of Washington by statute, RCW 10.95. In *Bartholomew* II, this court found portions of that statute to be unconstitutional under our state constitution. We therefore must examine that statute, along with the case law limiting it, in light of the issue of admissibility of victim impact evidence at special sentencing proceedings.

Specifically, the evidence admissible in a special sentencing proceeding is determined by RCW 10.95.060(3) and .070. RCW 10.95.060(3) states in pertinent part:

> The court shall admit any relevant evidence which it deems to have probative value regardless of its admissibility under the rules of evidence, including hearsay evidence and evidence of the defendant's previous criminal activity regardless of whether the defendant has been charged or convicted as a result of such activity.

RCW 10.95.070 provides:

> In deciding the question posed by RCW 10.95.060(4) ["Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?"], the jury, . . . may consider any relevant factors, including but not limited to the following: [list of factors.]

Thus, on the face of Washington's death penalty statute, evidence received at death sentencing hearings is limited

only by the requirement of relevance. However, in 1984, this court in *Bartholomew* II held some of the language quoted above to be unconstitutional and limited the kinds of evidence the prosecution may present at a special sentencing proceeding. Noting that evidence presented at a capital sentencing proceeding must be accurate, reliable, and not unduly prejudicial to the defendant, this court found that RCW 10.95.060(3) and 10.95.070 violated the Eighth Amendment as well as article 1, sections 3 and 14 of the Washington State Constitution.[75] The court also found that the due process clause of our state constitution requires that evidence introduced in capital cases conform to the Rules of Evidence.

The *Bartholomew* II court further found that consideration of evidence of other crimes of which the Defendant was not convicted violated the cruel punishment and due process sections of the Washington State Constitution.[76] In *State v. Lord*, 117 Wn.2d 829, 889-90, 822 P.2d 177 (1991), *cert. denied*, 121 L. Ed. 2d 112 (1992), we clarified this ruling by holding that this rule is limited to the State's case in chief, and that evidence of uncharged criminal behavior can be offered to rebut mitigation evidence presented by the defendant.

In addition, the court in *Bartholomew* II held that the statutory directives to consider "any relevant evidence" and "any relevant factors" must be limited to mitigating evidence and factors. Finally, the *Bartholomew* II court found that "evidence of nonstatutory aggravating factors must be limited to defendant's criminal record, evidence that would have been admissible at the guilt phase, and evidence to rebut matters raised in mitigation by the defendant", the latter of which may only be admitted if the rebuttal value of the evidence outweighs the prejudicial effect.[77] We have con-

---

[75]*Bartholomew* II, 101 Wn.2d at 639.

[76]*Bartholomew* II, 101 Wn.2d at 641-42.

[77]*Bartholomew* II, 101 Wn.2d at 642-43.

sistently and recently adhered to these holdings of *Bartholomew* II.[78]

The State argues that *Bartholomew* II should be overruled in its entirety. It asks that both victim impact statements and evidence of prior uncharged crimes be held admissible and that the Rules of Evidence be held to not be applicable in special sentencing proceedings. Such fundamental changes in the jurisprudence of capital sentencing law in this state are unnecessary to the resolution of this case and we therefore decline the invitation to overrule *Bartholomew* II in its entirety. In this case, there is no issue regarding prior uncharged crimes or application of the Rules of Evidence. The only issue properly before us is the constitutionality of the admission of victim impact evidence in capital cases. The critical question with regard to victim impact evidence is relevance, which would be a statutorily required prerequisite even without the holdings of *Bartholomew* II.[79]

In limiting the categories of evidence admissible at a death sentencing proceeding, the court specifically stated in *Bartholomew* II that it was relying on independent state constitutional grounds.[80] Under *Bartholomew* II, victim impact evidence does not fit within any of the categories of evidence held to be admissible during the special sentencing phase of a capital case. However, when *Bartholomew* II was decided, the victims' rights amendment (Const. art. 1, § 35 (amend. 84)), was not yet part of our state constitution. Rather, in

---

[78]*State v. Jeffries*, 105 Wn.2d 398, 416, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986); *State v. Mak*, 105 Wn.2d 692, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986), *sentence vacated on writ of habeas corpus sub nom. Mak v. Blodgett*, 754 F. Supp. 1490 (W.D. Wash. 1991), *aff'd*, 970 F.2d 614 (9th Cir. 1992), *cert. denied*, 113 S. Ct. 1363 (1993); *State v. Rupe*, 108 Wn.2d 734, 755, 761-62, 743 P.2d 210 (1987), *cert. denied*, 486 U.S 1061 (1988); *State v. Rice*, 110 Wn.2d 577, 609, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910 (1989); *In re Rupe*, 115 Wn.2d 379, 396 n.5, 798 P.2d 780 (1990); *State v. Lord*, 117 Wn.2d 829, 889-91, 822 P.2d 177 (1991), *cert. denied*, 121 L. Ed. 2d 112 (1992); *State v. Ortiz*, 119 Wn.2d 294, 304, 831 P.2d 1060 (1992); *State v. Dodd*, 120 Wn.2d 1, 21, 838 P.2d 86 (1992).

[79]RCW 10.95.060(3).

[80]*Bartholomew* II, 101 Wn.2d at 644.

1984, the court was construing a constitution which is a different constitution than the one we examine today. The question here then becomes, what effect does the new victims' rights amendment have on our constitutional analysis of the death penalty statute as it relates to victim impact evidence? We turn, therefore, to this new state constitutional amendment.

In 1989, at the request of then Attorney General Eikenberry, the Legislature, in an effort to give certain rights to crime victims and to encourage victims to cooperate in the prosecution of crimes, *unanimously* passed Senate Joint Resolution 8200, offering Washington's electorate the opportunity to add a victims' rights provision to the state constitution.[81] The voters of the State of Washington overwhelmingly accepted the amendment; *78 percent of those voting cast ballots in favor of the amendment*.[82] The amendment is codified as Const. art. 1, § 35 (amend. 84), and provides in pertinent part:

> Upon notifying the prosecuting attorney, *a victim of a crime charged as a felony shall have the right to* be informed of and, subject to the discretion of the individual presiding over the trial or court proceedings, attend trial and all other court proceedings the defendant has the right to attend, and to *make a statement at sentencing* and at any proceeding where the defendant's release is considered, subject to the same rules of procedure which govern the defendant's rights. *In the event the victim is deceased,* incompetent, a minor, or otherwise unavailable, *the prosecuting attorney may identify a representative to appear to exercise the victim's rights.*

(Italics ours.)

The addition of the victims' rights amendment creates a potential tension between the due process rights of the capital case defendant (as interpreted by *Bartholomew* II) and the victims' constitutional rights added by Const. art. 1, § 35 (amend. 84). The prosecuting attorney and amicus (the Attorney General) argue that the later amendment "overrules" the

---

[81]*Final Legislative Report*, 51st Legislature (1989) (SJR 8200).

[82]Clerk's Papers, at 2529-30; Secretary of State, Official Returns of the State General Election held on November 7, 1989.

prior state constitutional construction. We conclude, however, that these two parts of the constitution can be harmonized.

A new constitutional provision prevails over prior provisions of the constitution if (1) it specifically repeals them, or (2) it cannot be harmonized with them. Nevertheless, it is settled that implied repeal of one constitutional provision by another is not favored, and every reasonable effort will be made to give effect to both provisions;[83] that can be done in this case.

The victims' rights amendment does not "specifically repeal" any provision of the state constitution or this court's construction of the state due process clause. In fact, this court in *Bartholomew* II did not even consider, discuss or rule on the admissibility of victim impact evidence.

The question then is how Const. art. 1, §§ 3, 14 (due process and cruel punishment) should be harmonized with Const. art. 1, § 35 (amend. 84) (victims' rights). Harmony can be achieved in one of two ways: (1) we could hold that the victims' rights amendment does not (and cannot) apply to victim impact evidence in death penalty cases, (but such evidence would be admissible in other felony cases); or (2) we can hold that the categories of evidence which are admissible at a death sentencing proceeding can be expanded to include victim impact evidence.

Should we adopt the former conclusion, the irony would be that in cases involving the most heinous crimes of all, the victim's representative would be prohibited from making a victim impact statement while in other murder cases, the victim's representative would be allowed to make such a statement. Furthermore, the victims' rights amendment expressly contemplates the right to use victim impact evidence "[i]n the event the victim is deceased". We conclude that the second construction more clearly gives meaning to all parts of the Washington State Constitution. Although defendants in capital cases have always had substantial due

---

[83]*Port of Longview v. Taxpayers*, 85 Wn.2d 216, 232-33, 533 P.2d 128 (1974) (quoting *Jackson v. Consolidated Gov't*, 225 So. 2d 497, 500-01 (Fla. 1969)).

process rights during the sentencing phase of the trial, *the victim also now has constitutional rights*[84] and these must be harmonized with the defendant's rights. *Bartholomew II* held that the state due process clause requires that the Rules of Evidence be applied to capital sentencing proceedings.[85] In order to be admissible, victim impact evidence has to be relevant.[86] ER 401 provides:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

The pivotal question is the relevance of victim impact evidence to the question which a jury must answer in the death sentencing proceeding. The jury must answer this question:

> "*Having in mind the crime* of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?"

(Italics ours.) RCW 10.95.060(4).

The majority of the United States Supreme Court in *Payne v. Tennessee*, 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991) disagreed with that court's prior majority opinion in *Booth v. Maryland*, 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529 (1987) that only the characteristics of the defendant and the circumstances of the crime were relevant to the capital sentencing determination. The Court in *Payne* noted that the specific harm caused by the murder may play a role in a meaningful assessment of the defendant's moral culpability and blameworthiness, and that the *harm* caused by a defendant as a result of a crime has historically been an important concern of the criminal law.[87] Certainly, the harm caused in this case includes the loss of a

---

[84]Const. art. 1, § 35 (amend. 84).

[85]*See also Ortiz*, 119 Wn.2d at 304.

[86]ER 401; RCW 10.95.060(3).

[87]*See Payne v. Tennessee*, 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991).

child's life, hopes, and dreams and the grief experienced by the child's family.

The *Payne* majority noted that states cannot preclude the sentencer from considering any relevant mitigating evidence that the *defendant* proffers, thus requiring that the defendant be treated as a "uniquely individual human being". Just as defendants should be treated as unique individuals, evidence should now be allowed to show each *victim's* uniqueness as an individual human being. In this case, the expected loss *to the family of the defendant* if he is sentenced to death has been allowed to be considered by the jury in sentencing; surely the loss *to the innocent victim's family* must be at least as relevant.

The majority in *Payne* said that the *Booth* Court's ban on victim impact evidence had unfairly weighted the scales in a capital trial — that while virtually no limits were placed on the relevant mitigating evidence a defendant could introduce concerning his own circumstances, the State was barred from either offering a glimpse of the life which the defendant chose to take or demonstrating the loss to the victim's family and to society. Hence, the Supreme Court in *Payne* concluded that a state may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed; we do hereby so conclude.

We also agree with Justice Souter's concurring opinion in *Payne*. It addresses the relevancy issue. He explains as follows. Murder has foreseeable consequences and every defendant, if endowed with the mental capacity for criminal responsibility, knows that the life he or she will take by homicidal behavior is that of a unique person and that the person to be killed probably has close associates, "survivors", who will suffer harms and deprivations as a result of the victim's death. When a defendant chooses to kill, this necessarily relates to a whole human being and threatens an association of others who may be distinctly hurt. The fact the defendant may not know the details of the victim's

life or the needs of the victim's survivors should not obscure the facts that death is always to a unique individual and *harm to some group of survivors is a consequence so foreseeable as to be virtually inevitable.* The foreseeability of the killing's consequences imbues them with direct moral relevance.[88]

In this case, where the murderer was found to have intended to take the life of a child, we cannot simply conclude, as we are asked to do by the Defendant, that the harm caused to that child's family is irrelevant. As Justice O'Connor points out:

> "Murder is the ultimate act of depersonalization." It transforms a living person with hopes, dreams, and fears into a corpse, thereby taking away all that is special and unique about the person. The Constitution does not preclude a State from deciding to give some of that back.

(Citation omitted.) *Payne*, at 832 (O'Connor, J., concurring). Again, we agree.

The Washington State Constitution speaks powerfully to these fundamental principles. Const. art. 1, § 35 (amend. 84) provides in relevant part:

> *To ensure victims a meaningful role in the criminal justice system and to accord them due dignity and respect, victims of crime are hereby granted the following basic and fundamental rights.*
>
> *. . . a victim of a crime charged as a felony shall have the right . . . to make a statement at sentencing . . . In the event the victim is deceased, . . . the prosecuting attorney may identify a representative to appear to exercise the victim's rights.*

(Italics ours.)

The language of Const. art. 1, § 35 (amend. 84) is without exception. There is nothing in either the language or the history of this amendment to suggest that capital cases should be excepted from the clear wording of the constitutional amendment giving to murder victims' representatives the right to make statements. We conclude that the Legislature and the voters of the State of Washington intended that a crime victim, or a victim's representative, should be allowed to make a

---

[88]*Payne*, at 835-39 (Souter, J., concurring).

statement unless there is a direct constitutional impediment. Once the Supreme Court allowed victim impact evidence in *Payne*, any per se federal constitutional bar to the admission of such evidence was removed. The mandate of the people of the State of Washington, as expressed through the constitutional amendment processes culminating in adoption of the victims' rights amendment to our state constitution, is to give to victims of crime the right to participate in the judicial process by making a statement at the defendant's sentencing. We are bound to enforce this law absent a constitutional prohibition,[89] and hereby do so.

The Defendant in this case also argues that allowing victim impact evidence will really result in allowing "victim worth" evidence and that the murder of more reputable victims may result in the death penalty for a defendant whereas the murder of those with less stature may not. While we recognize this potential danger, it is not of such consequence that we should disallow all evidence by which the jury learns of the harm caused by the Defendant's crime. The Defendant's argument in this regard essentially involves a policy issue and not a legal issue and we defer to the judgment of the Legislature and the voters on the wisdom of allowing victim impact evidence. Furthermore, we adopt the response of the Supreme Court of Nevada to this same argument:

> We find the argument unpersuasive. The key to criminal sentencing in capital cases is the ability of the sentencer to focus upon and consider both the individual characteristics of the defendant and the nature and impact of the crime he committed. Only then can the sentencer truly weigh the evidence before it and determine a defendant's just deserts. Apropos to the point is the statement by the venerable Justice Cardozo in Snyder v. Massachusetts, 291 U.S. 97, 122[, 78 L. Ed. 674, 54 S. Ct. 330, 338] (1934), that "justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true."
>
> . . . [The Defendant] created the evidence portraying the immutably tragic consequences to his victims and their loved

---

[89]*State v. Campbell*, 103 Wn.2d 1, 34, 691 P.2d 929 (1984), *cert. denied*, 471 U.S. 1094 (1985).

ones. He is hardly in a position to complain that a jury of his peers was given a fair exposure to his handiwork.

*Homick v. State,* 108 Nev. 127, 137, 825 P.2d 600, 606-07 (1992).

 Having decided that there is no federal or state constitutional ban on the admission of victim impact evidence in capital cases, we must decide whether the Legislature must first statutorily authorize such evidence. As explained above, the Legislature has already authorized the admission of all relevant evidence at the special sentencing procedure in a capital case.[90] In *Bartholomew* II, we narrowed that class of admissible evidence based on this court's construction of the Washington State Constitution. In light of the addition of the victims' rights amendment to our constitution, we now expand the classes of relevant evidence which may constitutionally be admitted to also include victim impact evidence.

The special sentencing proceedings statute, RCW 10.95.060, evinces a legislative intent to allow as broad a class of evidence as is constitutionally permissible at the penalty phase of a capital trial. Therefore, we conclude that it would be an unnecessary act to now require the Legislature to *again* reiterate its intent that a victim impact statement may be made by a murder victim's family member at the sentencing phase of a capital case. The constitutional impediment to the introduction of such evidence having been removed,[91] such evidence was properly admissible under the existing statute.[92]

By ruling as we have, we join the majority of states that have considered the issue of victim impact evidence in capital cases and have concluded that it is admissible.[93] We con-

---

[90]RCW 10.95.060(3).

[91]*Payne v. Tennessee, supra.*

[92]RCW 10.95.060(3).

[93]*E.g., McMillian v. State,* 594 So. 2d 1253, 1274 (Ala. Crim. App. 1991); *People v. Edwards,* 54 Cal. 3d 787, 832-33, 819 P.2d 436, 465-67, 1 Cal. Rptr. 2d 696, 725 (1991), *cert. denied,* 113 S. Ct. 125 (1992); *Hodges v. State,* 595 So. 2d

cur with those states that have concluded that some victim impact evidence is relevant, and we conclude that such evidence does not constitute a per se violation of the due process clause of the Washington State Constitution.

We also conclude that such evidence does not violate our state constitution's prohibition against cruel punishment.[94] In *State v. Dodd*, 120 Wn.2d 1, 21-22, 838 P.2d 86 (1992), we held that in the context of our death penalty review procedures, we need not interpret Const. art. 1, § 14, the cruel punishment clause of the state constitution, more broadly than the Eighth Amendment to the federal constitution. In questions regarding the interpretation of Const. art. 1, § 14, we look to current community standards, objective indicia of which include the statutes and cases of other jurisdictions as well as our own.[95] As noted above, case law from across the country indicates that the introduction of victim impact statements at capital sentencing hearings is increasingly gaining wide acceptance. Many states have enacted statutes which allow for victim impact statements.[96]

---

929, 933 (Fla.), *cert. granted, judgment vacated*, 113 S. Ct. 33 (1992), *reaff'd*, 619 So. 2d 272, *cert. denied*, 114 S. Ct. 560 (1993); *State v. Card*, 121 Idaho 425, 432-33, 825 P.2d 1081, 1088-89 (1991), *cert. denied*, 113 S. Ct. 321 (1992); *State v. Howard*, 147 Ill. 2d 103, 588 N.E.2d 1044, 1066-67 (1991); *People v. Pasch*, 152 Ill. 2d 133, 604 N.E.2d 294, 322 (1992), *cert. granted*, 113 S. Ct. 2927, *cert. dismissed*, 114 S. Ct. 337 (1993); *Bellmore v. State*, 602 N.E.2d 111, 121 (Ind. 1992); *Benirschke v. State*, 577 N.E.2d 576, 578 (Ind. 1991), *cert. denied*, 112 S. Ct. 3042 (1992); *Evans v. State*, 333 Md. 660, 684-91, 637 A.2d 117, 129-32 (1994); *State v. Williams*, 239 Neb. 985, 1001-02, 480 N.W.2d 390, 401 (1992); *Homick v. State*, 108 Nev. 127, 135-38, 825 P.2d 600, 605-07 (1992); *State v. Lorraine*, 66 Ohio St. 3d 414, 421, 613 N.E.2d 212, 219 (1993), *cert. denied*, 114 S. Ct. 715 (1994); *State v. Johnson*, 306 S.C. 119, 132, 410 S.E.2d 547, 555 (1991), *cert. denied*, 112 S. Ct. 1691 (1992); *Lucas v. Evatt*, 308 S.C. 31, 33, 416 S.E.2d 646, 647 (1992); *State v. Smith*, 857 S.W.2d 1, 14 (Tenn.), *cert. denied*, 114 S. Ct. 561 (1993); *State v. Young*, 853 P.2d 327, 353 (Utah 1993).

[94]Const. art. 1, § 14.

[95]*Campbell*, 103 Wn.2d at 31-34.

[96]*See* Kathryn E. Bartolo, Comment, Payne v. Tennessee: *The Future Role of Victim Statements of Opinion in Capital Sentencing Proceedings*, 77 Iowa L. Rev. 1217, 1246 nn.211-13 (1992); Richard L. Slowinski, Note, South Carolina v. Gathers: *Prohibiting the Use of Victim-Related Information in Capital Punishment Proceedings*, 40 Cath. U. L. Rev. 215, 216 n.10 (1990).

Because of the general acceptance of victim impact evidence across the country, as well as our own State's acceptance of victim impact evidence, as demonstrated by the adoption of RCW 7.69.030 and Const. art. 1, § 35 (amend. 84), we conclude that the Washington State Constitution does not provide a per se prohibition against the introduction of such evidence based on the bar to cruel punishment.

■ Because we conclude that victim impact statements do not *per se* violate the Washington State Constitution, this does not mean that any and all such evidence is admissible. Under *Bartholomew* II, ER 403 applies to capital sentencing proceedings. This allows a trial court to place certain reasonable limits on the amount and scope of victim impact evidence. The Supreme Court of California, which allows victim impact evidence in a capital case, warns that such evidence is not without limits. We agree. The jury must face its obligations soberly and rationally, and should not be given the impression that it may allow emotion to reign over reason. Therefore, in each case it is the trial court's function to strike a careful balance between the probative and the prejudicial.

We agree with the decision in *People v. Raley*, 2 Cal. 4th 870, 830 P.2d 712, 8 Cal. Rptr. 2d 678 (1992), *cert. denied*, 113 S. Ct. 1352 (1993) wherein the California Supreme Court explained a trial court's function in that regard as follows:

> On the one hand, it should allow evidence and argument on emotional though relevant subjects that could provide legitimate reasons to sway the jury to show mercy or to impose the ultimate sanction. On the other hand, irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response should be curtailed.

*Raley*, 2 Cal. 4th at 916 (citing *People v. Edwards*, 54 Cal. 3d 787, 836, 819 P.2d 436, 1 Cal. Rptr. 2d 631 (1991)).

We therefore conclude that victim impact evidence is admissible in the sentencing phase of capital cases and that trial courts, which are experienced in balancing the probative against the prejudicial, should exercise their informed discretion in deciding the scope of permissible victim impact

evidence in a given case. In the case before us, there was no error in the admission of the victim's father's statements about his young murdered daughter or about the profound effect of the murder upon her family. As the *Payne* Court recognized, victim impact evidence may properly include a description of the emotional trauma suffered by the victim's family.

The Defendant also argues that the introduction of any victim impact evidence will make the proportionality review engaged in by this court pursuant to RCW 10.95.130(2) impossible because emotional and irrelevant evidence will be introduced. We have already explained above that victim impact evidence is *not* irrelevant to the jury's decision in the penalty phase of a capital case and such evidence is subject to an ER 403 balancing test by the trial court. The fact that some of the evidence in a murder trial is emotional does not render a proportionality review impossible. A proportionality review is an independent review conducted by this court which focuses on the defendant and on the crime committed and which seeks to avoid the systemic problems of random arbitrariness and the imposition of the death sentence based on race.[97] There is nothing whatsoever about the introduction of constitutionally permissible victim impact evidence which renders that proportionality review impossible.

ISSUE THIRTEEN.

CONCLUSION. The trial court did not abuse its discretion in excusing two prospective jurors after those jurors indicated that, because of their attitudes toward the death penalty, they could not assure the trial court that they would be able to follow the law in the penalty phase of the proceeding.

Defendant argues that the trial court's decision to grant the prosecuting attorney's motion to excuse two potential jurors for cause due to their views on the death penalty constituted error, requiring a reversal of the death sentence.[98]

---

[97]*State v. Lord*, 117 Wn.2d 829, 822 P.2d 177 (1991), *cert. denied*, 121 L. Ed. 2d 112 (1992).

[98]Only the sentence of death and not the underlying conviction is subject to being reversed in a capital case on the ground that a juror was erroneously

The process of "death qualifying" a jury in a capital case has consistently been upheld by the United States Supreme Court and has specifically been upheld in Washington.[99] It is the process whereby a prospective juror may appropriately be questioned about the death penalty and may then be challenged for cause if the juror's views on capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.[100]

■■■ A trial court's ruling in a capital case on a challenge to a prospective juror for cause will not be reversed absent a manifest abuse of discretion.[101] On review we give deference to the trial court's factual finding that a prospective juror's state of mind with respect to the death penalty is such that he or she can or cannot try the case fairly and impartially.[102] The reason for this deference is that the trial judge is able to observe the juror's demeanor and, in light of that observation, to interpret and evaluate the juror's answers to determine whether the juror would be fair and impartial.[103]

---

excused for cause because of the juror's attitude toward the death penalty. *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, *reh'g denied*, 393 U.S. 898 (1968); *State v. Furman*, 122 Wn.2d 440, 450, 858 P.2d 1092 (1993).

[99]*State v. Mak*, 105 Wn.2d 692, 707, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986), *sentence vacated on writ of habeas corpus sub nom. Mak v. Blodgett*, 754 F. Supp. 1490 (W.D. Wash. 1991), *aff'd*, 970 F.2d 614 (9th Cir. 1992), *cert. denied*, 113 S. Ct. 1363 (1993); *State v. Hughes*, 106 Wn.2d 176, 181, 721 P.2d 902 (1986) (citing *Lockhart v. McCree*, 476 U.S. 162, 90 L. Ed. 2d 137, 106 S. Ct. 1758 (1986); *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 105 S. Ct. 844 (1985); *Adams v. Texas*, 448 U.S. 38, 65 L. Ed. 2d 581, 100 S. Ct. 2521 (1980); *Witherspoon v. Illinois, supra*.

[100]*State v. Hughes*, 106 Wn.2d at 181 (quoting *Wainwright v. Witt*, 469 U.S. at 424). *See also* CrR 6.4(c); RCW 4.44.170(2).

[101]*State v. Rupe*, 108 Wn.2d 734, 750, 743 P.2d 210 (1987), *cert. denied*, 486 U.S. 1061 (1988); *Mak*, 105 Wn.2d at 707.

[102]*Wainwright*, 469 U.S. at 425-26; *In re Lord*, 123 Wn.2d 296, 309, 868 P.2d 835 (1994).

[103]*Wainwright*, 469 U.S. at 426; *Rupe*, 108 Wn.2d at 749. *See also State v. Noltie*, 116 Wn.2d 831, 839, 809 P.2d 190 (1991) (quoting 14 Lewis H. Orland & Karl B. Tegland, Wash. Prac., *Trial Practice* § 203, at 332 (4th ed. 1986)).

The standard to be applied by the trial court in ruling on a challenge for cause is the following: a prospective juror in a capital case may be excused for cause if that juror's attitude toward the death penalty would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.[104]

The trial judge in the present case excused two potential jurors after finding their beliefs regarding the death penalty would substantially impair the performance of their duties as jurors in this case.

Each of the jurors filled out a written questionnaire, was questioned by the trial judge and then subjected to examination by the prosecuting attorney and defense counsel. We have carefully reviewed the questionnaires and the testimony of the two jurors involved here.

The prospective jurors independently testified, in part, that they were uncertain that they would be able to impose the death penalty. They also testified that they could not assure the trial court that they would be able to follow the instructions of the court regarding imposition of the death penalty.

The trial court granted the State's motions to excuse each of these jurors for cause and we defer to the judgment of the trial court in each instance. The question is not whether we, as a reviewing court, might disagree with the trial court's findings, but whether those findings are fairly supported by the record.[105]

---

[104]*In re Lord*, 123 Wn.2d at 309; *Hughes*, 106 Wn.2d at 181 (citing *Wainwright*, 469 U.S. at 424).

Defendant argues that this court should limit challenges for cause to those that meet the standard set forth in a footnote in *Witherspoon v. Illinois*, 391 U.S. at 522 n.21. The *Witherspoon* standard, as interpreted by the Defendant, would require that before a juror may be excused for cause, the juror must make it unmistakably clear that (1) the juror would *automatically* vote against the death penalty or (2) that the juror's attitude toward the death penalty would prevent him or her from making an impartial decision during the guilt phase. This standard was referred to as dicta by the Supreme Court in 1984 in *Wainwright*, 469 U.S. at 422. As stated herein, we follow the standard enunciated by the Supreme Court in *Wainwright* and *Adams v. Texas*, 448 U.S. 38, 65 L. Ed. 2d 581, 100 S. Ct. 2521 (1980). *See In re Lord; Rupe; Mak*, 105 Wn.2d at 692. *See also Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222 (1992).

[105]*Wainwright*, 469 U.S. at 434.

The record supports the trial court's decision with respect to these jurors. Additionally, the trial court had an opportunity to observe the prospective jurors' demeanor as they responded to the questions asked. A reasonable trier of fact could determine that the responses of these jurors evidenced an attitude toward imposition of the death penalty that would prevent or substantially impair their abilities to perform the duties of a juror. The trial court did not err in excusing them from serving on the panel.

ISSUE FOURTEEN.

CONCLUSION. There was no error in admitting a judgment and sentence as evidence of the Defendant's past criminal record during the penalty phase of the trial.

During the penalty phase of the trial, the prosecuting attorney read the judgments and sentences of the Defendant's prior criminal convictions to the jury. All of the judgments and sentences were read without defense objection.

Penalty phase exhibit 3, a certified copy of the judgment and sentence relating to a 1988 conviction for rape in the first degree, included the information that: the Defendant had committed rape in the first degree, that the maximum term for that crime was life imprisonment, that the presumptive sentencing range was 96 to 120 months, that there existed substantial and compelling reasons justifying an exceptional sentence, that he was sentenced to 240 months of confinement, and that he was ordered to pay certain court costs. The judgment and sentence was signed by Judge Terence Hanley, the trial judge in this case.

■■■ Under RCW 10.95.060(3) and RCW 10.95.070(1), prior convictions are admissible in the penalty phase of a capital case.[106] Although the defense made no objection to the admission of the certified copies of judgments and sentences to show past convictions, the Defendant now argues that the information admitted went beyond the scope of what was admissible, and that the fact that Judge Hanley was the sen-

---

[106]*State v. Bartholomew*, 101 Wn.2d 631, 642, 683 P.2d 1079 (1984) (*Bartholomew II*); *State v. Lord*, 117 Wn.2d 829, 890, 822 P.2d 177 (1991), *cert. denied*, 121 L. Ed. 2d 112 (1992).

tencing judge in the rape conviction was prejudicial and constituted an unconstitutional comment on the evidence.

The defense now argues that ER 609 should have been applied to determine the admissibility of the prior conviction and that the trial court should have therefore balanced the probative and the prejudicial information in the previous judgment and sentence to determine its admissibility. ER 609(a). We disagree. ER 609 does not apply when prior convictions are admissible as substantive evidence; the rule relates only to impeachment by evidence of a conviction.[107] In the penalty phase of a capital case, the evidence of a prior conviction is being introduced not to attack credibility, but as substantive evidence which constitutes an aggravating factor.[108]

The defense also appears to be arguing that the information in the judgment and sentence which indicates that the Defendant was given a sentence longer than the presumptive sentence was "prejudicial" and therefore inadmissible. Evidence is not excluded because it is "prejudicial" but because it is *unfairly* prejudicial.[109] In *State v. Bartholomew*, 101 Wn.2d 631, 641, 683 P.2d 1079 (1984) (*Bartholomew II*), this court explained that categories of admissible aggravating evidence are designed to disallow evidence which is untrustworthy, unreliable and unreasonably prejudicial.[110] A certified copy of a judgment and sentence is highly reliable and the imposition of a prior exceptional sentence is relevant to the penalty phase issue. The imposition of an exceptional

---

[107]ER 609 cmt., *1994 Washington Rules of Court*, at 213. *See, e.g., State v. Ray*, 116 Wn.2d 531, 545, 806 P.2d 1220 (1991) (ER 609 applies when prior convictions are being admitted to impeach the credibility of a witness) (citing *State v. Brown*, 113 Wn.2d 520, 551-52, 782 P.2d 1013, 787 P.2d 906, 80 A.L.R.4th 989 (1989)); 5A Karl B. Tegland, Wash. Prac., *Evidence* § 234, at 227 (3d ed. 1989) (ER 609 concerned only with a conviction offered for the purpose of attacking the credibility of a witness).

[108]*Bartholomew* II, 101 Wn.2d at 642; *Lord*, 117 Wn.2d at 890; RCW 10.95.070(1).

[109]*See Lord*, 117 Wn.2d at 891.

[110]*See also Lord*, 117 Wn.2d at 890 (explaining that the reliability of the evidence is crucial).

sentence is authorized by statute, RCW 9.94A.120(2), and carefully regulated by case law.[111] In *State v. Gibson,* 32 Wn. App. 217, 221, 646 P.2d 786, *review denied,* 97 Wn.2d 1040 (1982), Justice Durham, writing for the Court of Appeals, recognized that when a conviction is introduced, it will show the nature of the offense and the extent of punishment.[112] We agree. Furthermore, the introduction of a certified copy of the judgment and sentence is the preferred way to introduce a prior conviction when it is admissible.[113] The information contained in the judgment and sentence did not exceed the scope of admissible aggravating evidence under *Bartholomew* II.

■■ The Defendant also argues that because the trial judge was also the sentencing judge in the prior rape conviction, his signature on the judgment and sentence constituted a comment on the evidence in violation of Const. art. 4, § 16. An impermissible comment is one which conveys to the jury a judge's personal attitudes toward the merits of the case or allows the jury to infer from what the judge said or did not say that the judge personally believed the testimony in question.[114] At the penalty phase of a capital case, the merits of the case are whether the jury is convinced that there are not sufficient mitigating circumstances to merit leniency. RCW 10.95.060(4). Judge Hanley made no comment on that issue.

The Defendant does not contend that Judge Hanley made any statements in front of the jury of his opinions regarding what sentence was merited; he contends that the act of admitting the prior rape conviction in which Judge Hanley

---

[111]*State v. Allert,* 117 Wn.2d 156, 163-64, 815 P.2d 752 (1991); *State v. Nordby,* 106 Wn.2d 514, 723 P.2d 1117 (1986).

[112]*See also State v. Coles,* 28 Wn. App. 563, 572, 625 P.2d 713, *review denied,* 95 Wn.2d 1024 (1981).

[113]*See, e.g., State v. Drummer,* 54 Wn. App. 751, 756, 775 P.2d 981 (1989); *State v. Johnson,* 33 Wn. App. 534, 537, 656 P.2d 1099 (1982); *see also* David Boerner, *Sentencing in Washington* 6-14 to 6-15 (1985).

[114]*State v. Swan,* 114 Wn.2d 613, 790 P.2d 610 (1990), *cert. denied,* 498 U.S. 1046 (1991).

had imposed a sentence greater than the presumed sentence constitutes a comment on the evidence. However, the judgment and sentence of the prior rape was not a comment on the evidence; it *was* the evidence. This court in *State v. Lord*, 117 Wn.2d 829, 822 P.2d 177 (1991), *cert. denied*, 121 L. Ed. 2d 112 (1992) recently explained that the trial court is charged with using its discretion to ensure that proper evidence is admitted and improper evidence is excluded. The admission of evidence, standing alone, cannot be considered an unconstitutional comment on the evidence.[115] Whether a remark constitutes a comment on the evidence is based upon the content of the communication, not only on who made the remark. We conclude that the admission of penalty phase exhibit 3 did not constitute an unconstitutional comment on the evidence by the trial judge.

ISSUE FIFTEEN.

CONCLUSION. The arguments of the State during closing argument were within permissible bounds, were not objected to by defense counsel, were not prejudicial to the Defendant and are not a ground for reversal.

Defendant argues that the prosecuting attorney committed misconduct during closing argument in the penalty phase of the trial in the following four ways: (1) The prosecuting attorney argued facts which were not in evidence; (2) the prosecuting attorney misstated the law; (3) the prosecuting attorney used a Biblical analogy between the murder of the victim and the story of David and Goliath; and (4) the tone of the prosecuting attorney's argument was unfairly emotional.

 ■ The law applicable to prosecutorial misconduct was recently summarized in *State v. Hoffman*, 116 Wn.2d 51, 804 P.2d 577 (1991):

---

[115]*Lord*, 117 Wn.2d at 863. *See also State v. Mak*, 105 Wn.2d 692, 757, 718 P.2d 407 (it is not a comment on the evidence when it does not convey to the jury the personal attitudes of the judge toward the merits of the cause), *cert. denied*, 479 U.S. 995 (1986), *sentence vacated on writ of habeas corpus sub nom. Mak v. Blodgett*, 754 F. Supp. 1490 (W.D. Wash. 1991), *aff'd*, 970 F.2d 614 (9th Cir. 1992), *cert. denied*, 113 S. Ct. 1363 (1993).

Where improper argument is charged, the defense bears the burden of establishing the impropriety of the prosecuting attorney's comments as well as their prejudicial effect. Reversal is not required if the error could have been obviated by a curative instruction which the defense did not request. The failure to object to a prosecuting attorney's improper remark constitutes a waiver of such error unless the remark is deemed to be so flagrant and ill intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury.

(Footnotes and citations omitted). *Hoffman*, 116 Wn.2d at 93.[116]

 Allegedly improper comments are to be viewed in the context of the entire argument.[117]

In the present case the Defendant did not object to any of the statements made in the prosecuting attorney's closing argument and now challenged by Defendant. Therefore, in order to require reversal, Defendant must demonstrate that any improper remark was so flagrant and ill intentioned that it was inherently prejudicial, and further that the prejudice caused by the remark could not have been neutralized by a jury instruction.

The Defendant claims that the prosecuting attorney improperly provided "new" information to the jury during closing argument when the prosecuting attorney inferred that the Defendant was a suspect in the first degree rape of another young woman *before* he killed the victim in this case. The Defendant argues there is nothing in the record to show when he became a suspect in the rape case, when he was charged or who testified against him.

 The judgment and sentence entered in the prior rape case was admitted in the penalty phase as penalty phase exhibit 3. The exhibit shows the name of the rape victim; the fact that she was alive at the time of the rape trial and sentencing; the date of the offense (Apr. 23, 1988); the date

---

[116]*See also State v. Ziegler*, 114 Wn.2d 533, 540, 789 P.2d 79 (1990); *State v. McFarland*, 73 Wn. App. 57, 62, 867 P.2d 660 (1994).

[117]*State v. Mak*, 105 Wn.2d 692, 698, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986), *sentence vacated on writ of habeas corpus sub nom. Mak v. Blodgett*, 754 F. Supp. 1490 (W.D. Wash. 1991), *aff'd*, 970 F.2d 614 (9th Cir. 1992), *cert. denied*, 113 S. Ct. 1363 (1993).

of the jury verdict of guilt (Oct. 28, 1988); and that at the time of sentencing (Dec. 20, 1988), the Defendant had been incarcerated for 93 days (since mid-September 1988) with respect to the prior rape offense. The jury also knew that he was incarcerated since July 13, 1988, on another offense and that even during that period of incarceration, the Defendant was a suspect in the murder of the victim in the present case. In closing argument a prosecuting attorney has wide latitude in drawing and expressing reasonable inferences from the evidence.[118]

From the information contained on the face of the judgment and sentence for the prior rape conviction, it is not unreasonable to infer that a victim-witness identified the Defendant as the perpetrator of a rape with a deadly weapon and that the identification may have occurred some months before the September 1988 trial for rape. It also is not unreasonable to infer that because of the identification, the Defendant became the focus of an investigation for that rape before he killed the young victim in the present case.

The Defendant also argues that the prosecuting attorney improperly argued that Defendant would pose a danger to persons within the prison system. Whether there is a likelihood that the Defendant will pose a danger to others in the future is a relevant consideration in the jury's determination during the penalty phase.[119]

The evidence introduced during the penalty phase of the trial showed that the Defendant had been convicted of rape with a deadly weapon and of manslaughter, as well as other crimes, before he was convicted of aggravated first degree murder in this case.

From the facts before the jury, it was not unreasonable for the prosecuting attorney to argue that the Defendant is a dangerous person who would continue to present a danger even while incarcerated.

---

[118]*State v. Hoffman*, 116 Wn.2d at 94-95; *Mak*, 105 Wn.2d at 698.

[119]RCW 10.95.070(8).

The statements challenged here were not new "facts" but inferences which could be reasonably drawn from the facts in evidence and argued.

Even if we were to find the arguments improper, which we do not, an instruction to the jury would have cured any possible prejudicial effect. None was requested. We note, however, that there is no showing here that the Defendant was prejudiced by the prosecuting attorney's statements. This argument by the prosecuting attorney does not require or justify reversal of the sentence.

The Defendant also argues that the prosecuting attorney prejudiced the case by misstating the law during closing argument. The law, as stated in the instructions to the jury, is the following:

> A mitigating circumstance is a fact about either the offense or about the defendant which in fairness or in mercy may be considered as extenuating or reducing the degree of moral culpability or which justifies a sentence of less than death, although it does not justify or excuse the offense.

Special sentencing proceeding instruction 5 (Clerk's Papers, at 2614).

The prosecuting attorney argued:

> And what's a "mitigating circumstance"? What factors can you consider? Well, you'll read some factors and I'll discuss them in a minute. But basically, a "mitigating factor" is something about the crime or the defendant which in fairness *and* mercy would lead you to believe that the state has not met its burden.

(Italics ours.) 80 Report of Proceedings, at 5789.

The reference to mercy and fairness was not objected to and does not appear to have been purposeful or prejudicial.

The prosecuting attorney went on to discuss the crime in detail and to discuss the victim impact statement of the victim's father. At the conclusion of that portion of the closing argument, the prosecuting attorney asked

> Was this fair; was this merciful?

80 Report of Proceedings, at 5799.

The jury had the right to consider the impact of this crime upon the victim and her family.[120] It also was proper for the jury to consider the circumstances of the crime.[121]

Furthermore, this argument by the prosecuting attorney was not objected to by the defense. Even if the argument of the prosecuting attorney had been improper in this regard, its impact upon the jury could have been cured by an instruction to the jury.

The Defendant next argues that the prosecuting attorney's reference to a Biblical story during closing argument had a racial effect and was improper.

During his closing argument on behalf of the Defendant, defense counsel made references to Biblical stories and quoted at length from the Bible.

The prosecuting attorney's rebuttal to that closing argument included the following:

> We could stand here and cite chapter and verse of the Bible, that book that speaks to us about morality and justice, forever, and everyone would have a different interpretation.
>
> But this particular case brings a particular Bible story to mind, and that is David and Goliath, and everyone, I would submit, has heard that story. And we all know that Goliath was evil, he was a plague on [the] children of Israel. And David, the hero in that story slew Goliath with a stone.
>
> But on June 13th, 1988, evil won with a stone. That was the man holding that stone (indicating).
>
> And the Bible talks a lot about justice. And that was just that Goliath was slain for what he did, for the evil he sought to bring down on the children . . . of Israel.

80 Report of Proceedings, at 5816-17.

█ A prosecuting attorney's remarks, even if they are improper, are not grounds for reversal if they were invited or provoked by defense counsel and are in reply to his or her acts and statements, unless the remarks are not a pertinent

---

[120]See discussion of victim impact statements herein, Issues 11 and 12, at 617-633.

[121]RCW 10.95.060(4); *State v. Rice*, 110 Wn.2d 577, 607, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910 (1989).

reply or are so prejudicial that a curative instruction would be ineffective.[122]

The Defendant argues that the State's reference to the Biblical story of David and Goliath was intended to evoke racist feelings. The Defendant claims that the use of the David and Goliath analogy evokes an image of the outsider from another tribe killing a member of the "children of Israel". In our view, this is a tortured interpretation of the use of this Biblical story.

Instead, the rebuttal here was invited or provoked by defense counsel's extensive use of Biblical stories during his own closing argument. In any event, if the remark was prejudicial at all, it was not so prejudicial that it could not have been cured with a cautionary explanation to the jury, had one been requested.

The Defendant additionally argues that the tone of the prosecuting attorney's closing argument unfairly appealed to the jury's emotions because it included a lengthy and graphic description of the victim's death and a detailed and speculative vision of her future.

The prosecuting attorney's argument did detail the circumstances of the crime. This is permissible so long as the argument does not invite an irrational or purely subjective response.[123]

Here the prosecuting attorney's closing argument capsulized the evidence regarding the killing of a young and innocent girl. The prosecuting attorney discussed the brutality of the crime, but not in a way that would have provoked an irrational response on the part of the jury. The prosecuting attorney's references to the impact on the victim and her family were not improper.

---

[122]*State v. Russell*, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994); *State v. Dennison*, 72 Wn.2d 842, 849, 435 P.2d 526 (1967); *State v. La Porte*, 58 Wn.2d 816, 822, 365 P.2d 24 (1961) (remarks of a prosecuting attorney, including remarks that would otherwise be improper, are not grounds for reversal where they are invited, provoked, or occasioned by defense counsel's statements).

[123]*Rice*, 110 Wn.2d at 606-09 (a prosecuting attorney is not muted because the acts committed arouse natural indignation); *State v. Fleetwood*, 75 Wn.2d 80, 84, 448 P.2d 502 (1968).

In sum, with respect to the claim of prosecutorial misconduct, the prosecuting attorney's closing argument in the penalty phase of the trial was within appropriate bounds.

ISSUE SIXTEEN.

CONCLUSION. The trial court properly instructed the jury on the definition of mitigating circumstances.

The defense now argues to this court that the very instruction it requested on mitigating circumstances, which was accepted and given, constitutes reversible error.

The defense's proposed instruction is identical in relevant part to the current WPIC 31.07 which states in pertinent part:

> A mitigating circumstance is a fact about either the offense or about the defendant which in fairness or in mercy may be considered as extenuating or reducing the degree of moral culpability or which justifies a sentence of less than death, although it does not justify or excuse the offense.
>
> The appropriateness of the exercise of mercy is itself a mitigating factor you may consider in determining whether the State has proved beyond a reasonable doubt that the death penalty is warranted.

Special sentencing proceeding instruction 5 (part) (Clerk's Papers, at 2614; 80 Report of Proceedings, at 5784).

The *State* objected to this instruction in the trial court, arguing that the instruction should read "in fairness *and* in mercy" rather than in "fairness *or* in mercy".[124] The court nevertheless gave the instruction proposed by the defense. The defense now argues that the use of the disjunctive is reversible error because it allowed the jury to consider mercy untethered to fairness and thus invited the emotional reaction that this court found unacceptable in *In re Rupe*, 115 Wn.2d 379, 798 P.2d 780 (1990).

The State argues that this issue should not be reviewed because if error, it was "invited error". This court adheres to the invited error doctrine which provides that a party may not request an instruction and then later complain on appeal that the requested instruction was given.[125] We recognize

---

[124] 80 Report of Proceedings, at 5772.

[125] *E.g., State v. Neher*, 112 Wn.2d 347, 352-53, 771 P.2d 330 (1989); *State v. Kincaid*, 103 Wn.2d 304, 314, 692 P.2d 823 (1985).

that there is some confusion in our case law regarding whether the invited error doctrine applies in capital cases. In *State v. Rice*, 110 Wn.2d 577, 611 n.19, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910 (1989), this court relied upon our prior decision in *State v. Mak*, 105 Wn.2d 692, 757, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986), *sentence vacated on writ of habeas corpus sub nom. Mak v. Blodgett*, 754 F. Supp. 1490 (W.D. Wash. 1991), *aff'd*, 970 F.2d 614 (9th Cir. 1992), *cert. denied*, 113 S. Ct. 1363 (1993) for the proposition that in that capital case we would review the invited error.

However, *Mak* does not fully support this conclusion. In *Mak*, while we did review in the alternative the error, we clearly stated that "any error in connection therewith was invited error and cannot be complained of on appeal".[126] The failure to except to an erroneous instruction is different from actually proposing an erroneous instruction; the former is a failure to preserve error, the latter is error invited by the defense. The State asks this court to clarify whether invited error will be reviewed in capital cases, citing cases from other jurisdictions which apply the invited error rule in capital cases.[127]

In *In re Rupe*, 115 Wn.2d 379, 382, 798 P.2d 780 (1990), we reviewed an instruction which had been proposed by defense counsel in the context of an ineffectiveness of counsel issue. We deem this to be the best solution to the issue of whether to apply the invited error doctrine in capital cases. We will adhere to our normal use of the invited error doctrine, but will review any invited instructional error in connection with an ineffectiveness of counsel argument; this will ensure that any error which was indeed

---

[126]*State v. Mak*, 105 Wn.2d 692, 748, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986), *sentence vacated on writ of habeas corpus sub nom. Mak v. Blodgett*, 754 F. Supp. 1490 (W.D. Wash. 1991), *aff'd*, 970 F.2d 614 (9th Cir. 1992), *cert. denied*, 113 S. Ct. 1363 (1993).

[127]*E.g., People v. Cummings*, 4 Cal. 4th 1233, 1326, 850 P.2d 1, 61, 18 Cal. Rptr. 2d 796 (1993), *cert. denied*, 128 L. Ed. 2d 219 (1994); *State v. McPhail*, 329 N.C. 636, 642, 406 S.E.2d 591, 596 (1991); *Tucker v. State*, 771 S.W.2d 523, 534 (Tex. Crim. App. 1988), *cert. denied*, 492 U.S. 912 (1989).

prejudicial could be grounds for reversal. The additional factor of actual prejudice required for a successful ineffectiveness of counsel claim[128] will in turn insure that the issue is of serious dimension. The California Supreme Court has recently held that it will not review invited error in capital cases, but explained that even a deliberate tactic by counsel can be an incompetent one and, thus, a defendant who is barred from raising instructional error by the invited error doctrine may assert ineffectiveness of counsel if prejudiced. *People v. Wader*, 5 Cal. 4th 610, 854 P.2d 80, 20 Cal. Rptr. 2d 788 (1993).

In the interest of judicial economy and because there has been some confusion on our scope of review, we will in this case address the issue of whether the language "mercy *or* fairness" in the mitigation instruction (special sentencing proceeding instruction 5) was erroneous. In fact, the exact language given in instruction 5 in this case has been given in several prior death penalty cases.[129]

 The defense relies on *In re Rupe*, 115 Wn.2d 379, 798 P.2d 780 (1990) to support its argument that the language must be "mercy and fairness". Although the language in *Rupe* was in the conjunctive, that decision does not hold it is error to use the disjunctive. The case only says that the "no sympathy" instruction (which was at issue in that case) did not conflict with the instruction given which defined mitigating circumstances in terms of mercy and fairness.[130] In *Rupe*, we held that a jury should not base its decision on sympathy.[131] The Defendant herein, Mr. Gentry, appears to equate "sympathy" with "mercy" and relies on the holding in *Rupe* that it is correct to give a "no sympathy" instruction for the proposi-

---

[128]*In re Riley*, 122 Wn.2d 772, 780, 863 P.2d 554 (1993); *State v. Jeffries*, 105 Wn.2d 398, 418, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986).

[129]*State v. Jeffries*, 105 Wn.2d 398, 422, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986); *Mak*, 105 Wn.2d at 752; *State v. Harris*, 106 Wn.2d 784, 793, 725 P.2d 975 (1986), *cert. denied*, 480 U.S. 940 (1987).

[130]*In re Rupe*, 115 Wn.2d 379, 397, 798 P.2d 780 (1990).

[131]*In re Rupe*, 115 Wn.2d at 388.

tion that mercy, alone, should not be considered by the jury. However, sympathy and mercy are different concepts; sympathy can be directed toward either the defendant or the victim whereas mercy can be directed only toward the defendant. In this case, the trial court's penalty phase jury instruction 1 concluded:

> You should bear in mind that your verdict must be based upon reason and not upon emotion. Throughout your deliberations you must not be influenced by passion, prejudice or sympathy. You may find mercy for the defendant to be a mitigating circumstance.

Clerk's Papers, at 2608-10. The defense has not assigned error to this instruction.

WPIC 31.07[132] uses the identical language given in penalty phase jury instruction 5 quoted above. Further, the committee comment to WPIC 31.03 states:

> The committee debated whether there was a difference between being influenced by passion, prejudice or sympathy and finding mercy to be a mitigating circumstance. The committee concluded that passion, prejudice and sympathy were "emotional" considerations, while a finding of "mercy" would be based on "reason".

WPIC 31.03 cmt., at 348.

We agree. This comment is well supported by our prior decisions holding that mercy is a proper circumstance which a capital case jury may consider.[133]

Penalty phase jury instruction 5 is not erroneous.

ISSUE SEVENTEEN.

CONCLUSION. The trial court was not required to give the jury the entire list of statutory mitigating circumstances when the Defendant requested they not be listed. The preferred manner of instructing the jury on mitigating circumstances is to include whatever statutory mitigating factors the defendant requests be included in the instructions, but not include specific nonstatutory factors. The jury should be

---

[132]The Washington Supreme Court Committee on Jury Instructions has recently promulgated pattern instructions for use in death penalty proceedings.

[133]*See Mak,* 105 Wn.2d at 754; *In re Rupe,* 115 Wn.2d at 407-08 (Utter, J., dissenting).

instructed it may consider other relevant mitigating factors offered by the defendant.

In the penalty phase of this case, the trial court instructed the jury as follows:

A mitigating circumstance is [defining mitigating circumstance].

. . . You are also to consider as mitigating circumstances any other factors concerning the offense or the defendant that you find to be relevant, including, but not limited to, the following:

Whether there is a likelihood that the defendant will pose a danger to others in the future;

The circumstances regarding the death of the defendant's father;

The defendant's behavior in dealing with $15,000 of misplaced money;

The impact of a sentence of death on the defendant and his family.

Special sentencing proceeding instruction 5 (Clerk's Papers, at 2614; 80 Report of Proceedings, at 5784).

The prosecution had proposed an instruction which listed all eight of the *statutory* mitigating circumstances. The State argues that the trial court should have included all possible statutory mitigating circumstances and should not have instructed regarding any specific nonstatutory ones. The State argues that "individually tailored" mitigating circumstances instruction may constitute a comment on the evidence violative of Const. art. 4, § 16.

This court has repeatedly held that it is not error for the trial court to give the jury the entire statutory list of mitigating circumstances even when some of them were clearly inapplicable in the particular case.[134] Additionally, we have held that it also is not error for the trial court to delete from

---

[134]*State v. Rupe*, 101 Wn.2d 664, 709-10, 683 P.2d 571 (1984) (not error to instruct on all eight statutory factors even though several clearly did not apply, and not error to fail to instruct on nonstatutory mitigating circumstances when the instruction told the jury it could consider any relevant factors, including, but not limited to, the listed statutory ones); *State v. Campbell*, 103 Wn.2d 1, 28, 691 P.2d 929 (1984) (not a comment on the evidence for an instruction to list statutory mitigating circumstances which were not asserted by the defendant), *cert. denied*, 471 U.S. 1094 (1985). *In re Rupe*, 115 Wn.2d 379, 397, 798 P.2d 780 (1990) (an instruction which lists, as nonexclusive, the statutory factors and informs the jury any relevant mitigating factors can be considered is proper).

the mitigation instruction those statutory mitigating circumstances which the Defendant did not wish to be listed.[135]

■ The comments to the WPIC regarding mitigating circumstances in capital cases suggest that the *Mak* rule is the better approach and that only those factors asserted by the defendant to be relevant should be included in the instruction to the jury.[136] We agree. Although we adhere to our prior decisions that it is not error for the trial court to give the jury the full list even when some are inapplicable, or in deleting those that the defendant did not wish to be listed, the better rule is the latter which allows the trial court to delete irrelevant statutory factors at the defendant's request. The State's proposed instruction including all eight factors, although not reversible error, is not the preferred instruction.[137]

However, the trial court here went beyond deleting the irrelevant statutory factors and added nonstatutory mitigating circumstances requested by the Defendant. The comments to the new WPIC 31.07, at 359, address this factual situation as follows:

> Whether or not nonstatutory relevant factors should be included in a jury instruction as a matter of law is an issue to be resolved by the trial court. See State v. Bartholomew, 101 Wn.2d 631, 683 P.2d 1079 (1984), *appeal after remand* 104 Wn.2d 844, 710 P.2d 196 (1985). If nonstatutory factors are included, those factors should be supported by case law and the evidence, and should be carefully articulated to avoid commenting on the evidence.

■ There is no constitutional requirement that each relevant mitigating circumstance be the subject of a specific in-

---

[135]*State v. Mak*, 105 Wn.2d 692, 757-58, 718 P.2d 407 (eight statutory factors serve as illustrations of the factors the jury might wish to consider in determining if there are sufficient mitigating circumstances to merit leniency), *cert. denied*, 479 U.S 995 (1986), *sentence vacated on writ of habeas corpus sub nom. Mak v. Blodgett*, 754 F. Supp. 1490 (W.D. Wash. 1991), *aff'd*, 970 F.2d 614 (9th Cir. 1992), *cert. denied*, 113 S. Ct. 1363 (1993); *State v. Jeffries*, 105 Wn.2d 398, 422, 717 P.2d 722 (not error for trial court to accede to defendant's request not to include any of the statutory factors in the mitigation instruction), *cert. denied*, 479 U.S. 922 (1986).

[136]WPIC 31.07 cmt., at 358.

[137]*See Mak*, 105 Wn.2d at 758; WPIC 31.07, at 357.

struction to the jury. The requirement is that such evidence be allowed to be presented to the jury, but a specific instruction as to each potentially mitigating factor is not mandated. *Johnson v. Texas*, 509 U.S. 350, 125 L. Ed. 2d 290, 113 S. Ct. 2658 (1993). In *Johnson*, the United States Supreme Court recently held that although youth is a mitigating circumstance that a capital sentencing jury must be allowed to consider, an instruction on youth as a mitigating factor is not mandated so long as the mitigating evidence is "within 'the effective reach of the sentencer.' "[138] An instruction which allows the jury to consider as mitigating circumstances any other factors concerning the offense or the defendant that the jury finds to be relevant allows the mitigating factors to be within the effective reach of the jury.[139] In this case, such language was used in penalty phase jury instruction 5.

In this case, the listing of nonstatutory mitigating factors was requested by, and was for the benefit of, the Defendant and we find no error in the trial court's instruction. However, for future cases, we conclude that the better practice is to include whatever *statutory* mitigating factors the defendant requests be included in the instructions, but that nonstatutory factors not be enumerated in the instruction. The instruction should include the language that the jury may consider as mitigating circumstances any other factors concerning the offense or the defendant that it finds relevant.[140] The mitigation instruction should avoid the language used by the trial court in this case (and timely excepted to by the State) that jurors "are to consider as mitigating" certain nonstatutory factors offered in mitigation; the decision as to whether proffered evidence *is*, in fact, mitigating should be left to the jury.

---

[138]*Johnson v. Texas*, 509 U.S. 350, 125 L. Ed. 2d 290, 306-07, 113 S. Ct. 2658 (1993).

[139]Penalty phase instruction 5, Clerk's Papers, at 2614; WPIC 31.07, at 357.

[140]*See, e.g., In re Rupe*, 115 Wn.2d at 398 (defendant should be allowed to present all relevant mitigating evidence); *see also Tuilaepa v. California*, ___ U.S. ___, 129 L. Ed. 2d 750, 114 S. Ct. 2630 (1994).

ISSUE EIGHTEEN.

CONCLUSION. The statutory question which a capital jury is required to answer is not unconstitutionally vague.

In the penalty phase of a capital case, the jury is required to answer the following statutory question which was included in the trial court's special sentencing proceeding instruction 4 (Clerk's Papers, at 2613):

> Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?

RCW 10.95.060(4).

The Defendant argues (without any supporting authority) that the question which the jury is to decide during the penalty phase of a capital case is unconstitutionally vague in violation of the Eighth Amendment and his due process rights.

The Defendant did not raise this issue below and in fact requested a substantially identical instruction. As explained above, in the future the doctrine of invited error will be applied in capital cases, but in this case we will address the issue.

In *State v. Benn*, 120 Wn.2d 631, 667, 845 P.2d 289, *cert. denied*, 114 S. Ct. 382 (1993), the defendant argued that the above quoted statutory question failed to channel jury discretion, promoted unequal administration of law and could not be comprehended by the sentencing jury. We answered that argument as follows.

> This court has previously stated that the particular question which is put to the jury as mandated by statute under RCW 10.95.060(4) satisfies due process and the Eighth Amendment. *See [State v.] Jeffries*, 105 Wn.2d [398,] 422-23[, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986)]; [*State v.*] *Campbell*, 103 Wn.2d [1,] 28[, 691 P.2d 929 (1984), *cert. denied*, 471 U.S. 1094 (1985)]; [*State v.*] *Bartholomew*, 101 Wn.2d [631,] 647[, 683 P.2d 1079 (1984)]; [*State v.*] *Rupe*, 101 Wn.2d [664,] 709[, 683 P.2d 571 (1984)].

*Benn*, 120 Wn.2d at 669.

In *Tuilaepa v. California*, ___ U.S. ___, 129 L. Ed. 2d 750, 114 S. Ct. 2630 (1994) the United States Supreme Court

explained that the requirement of individualized determination required in capital cases is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime. This is what a capital jury in this state is to focus on and penalty phase jury instruction 4 was followed by instruction 5, which informed the jury that it was to consider as mitigating circumstances any other factors concerning the offense or the defendant that it found to be relevant. Special sentencing proceeding instruction 5 (Clerk's Papers, at 2614). We conclude, as we have concluded repeatedly in the past, that RCW 10.95.060(4) is constitutional.

ISSUE NINETEEN.

CONCLUSION. There was sufficient evidence to support the jury's decision that there were not sufficient mitigating circumstances to merit leniency. The sentence of death is not excessive or disproportionate. The sentence was not a result of passion or prejudice.

Under our state's death penalty statute, this court reviews the jury's decision to impose the death penalty by analyzing three issues:

(a) Whether there was sufficient evidence to justify the affirmative finding to the question posed by RCW 10.95.060(4); and

(b) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant . . . ; and

(c) Whether the sentence of death was brought about through passion or prejudice[.]

RCW 10.95.130(2) (part).[141]

The jury answered "yes" to the question posed by RCW 10.95.060(4):

Having in mind the crime of which the defendant has been found guilty, has the State proven beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?

Clerk's Papers, at 2618.

The test to review the sufficiency of the evidence for that decision is whether:

---

[141]*State v. Lord*, 117 Wn.2d 829, 822 P.2d 177 (1991), *cert. denied*, 121 L. Ed. 2d 112 (1992).

after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found sufficient evidence to justify this affirmative finding beyond a reasonable doubt.

(Citations omitted.) *Lord*, 117 Wn.2d at 906. The mitigating circumstances asserted by the Defendant include that his family loved him, that no one had ever discussed with him the facts surrounding his mother killing his abusive father in self-defense when he was young, and that he had not stolen some money when there had been an apparent opportunity to do so. There was also extensive testimony from a number of the Defendant's family and friends that he had a loving mother and extended family that raised him and his brothers after his father's death. Evidence was also presented that he had strong positive male and female role models during his youth. There was no evidence of neglect or abuse of the Defendant. The mitigating circumstances are relatively unpersuasive in relation to the crime and his prior criminal history.

The Defendant was convicted of bludgeoning to death a 12-year-old child in order to conceal his identity regarding the sexual assault of the girl. He had previously been convicted of first degree rape, manslaughter and two burglaries. His crime was particularly brutal, his victim a child, his criminal background was violent and the mitigating circumstances minimal at best. In light of this, we conclude that there was indeed sufficient evidence for a rational trier of fact to have found that leniency was not merited.

RCW 10.95.130(2)(b) requires this court to also determine:

Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. For the purposes of this subsection, "similar cases" means cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120[.]

■ The concern in proportionality review is in avoiding two systemic problems in death sentences: random arbitrariness and imposition of the death sentence based on race.[142]

In this case, there is no evidence that race was a motivating factor for the jury, and contrary to the Defendant's suggestion, a review of the first degree aggravated murder cases in Washington does not reveal a pattern of imposition of the death penalty based upon the race of the defendant or the victim. The large majority of those sentenced to death in Washington under the current statute have been Caucasian (*e.g.*, Charles Campbell, Gary Benn, Brian Lord, David Rice, Patrick Jeffries, Mitchell Rupe, Wesley Dodd, Dwayne Bartholomew, Michael Furman, James Brett). Benjamin Harris, No. 29,[143] is an African American who was sentenced to death, but he also had killed before. Many African American defendants convicted of aggravated first degree murder (and hence eligible for the death penalty) have not been sentenced to death. *E.g., State v. Jose Nash*, No. 103 (defendant was African American and victim was Caucasian female); *State v. Emmett Nash*, No. 102 (defendant was African American and victim was Caucasian female); *State v. McKinley*, No. 105 (defendant was African American and the victims were African American females); *State v. Scott*, No. 109 (defendant was African American and the victim was an African American female); *State v. Russell*, No. 120 (defendant was African American and all three victims were Caucasian females); *State v. Graves*, No. 126 (defendant was African American and victim was Caucasian female); *State v. Brown*, No. 131 (defendant was African American and the victims were African American and Hispanic females); *State v. Galbert*, No. 33 (defendant was African American and the victim was Caucasian male); *State v. Knight*, No. 79 (defendant was African

---

[142]*Lord*, 117 Wn.2d at 909; *State v. Benn*, 120 Wn.2d 631, 680, 845 P.2d 289, *cert. denied*, 114 S. Ct. 382 (1993).

[143]The numbers refer to the sequential numbers assigned to the trial court's reports (required by RCW 10.95.120) as they are received by this court.

American and the victim was Caucasian female); *State v. Thomas*, No. 83 (defendant was African American and the victim was Caucasian female); *State v. Maryland*, No. 85 (defendant was African American and the victim was Caucasian female); *State v. Lewis*, No. 88 (defendant was African American and the victim was Caucasian male); *State v. Hankerson*, No. 90 (defendant was African American and the victim was Asian); *State v. Fountain*, No. 97 (defendant was African American and the victim was African American female).

The Defendant's brief lists 15 other murder convictions with superficial similarities for which the defendants were not sentenced to death and argues that this shows the death penalty was disproportionate in this case. We disagree. In reviewing those cases we conclude they are distinguishable from the present case. In none of the cases cited had the defendant killed before. In the only ones of those cases where the murder victims were children, either the defendant had no prior history of violent crimes (*State v. Hovland*, No. 6) or the defendant had very low intelligence (*State v. Brown*, No. 2) or the State had entered into a plea bargain because of lack of evidence which could have resulted in an acquittal (*State v. Sanders*, No. 81). Furthermore, in *Lord*, 117 Wn.2d at 910, we explained:

> Our review is not intended to ensure that there can be no variation on a case-by-case basis, nor to guarantee that the death penalty is always imposed in superficially similar circumstances . . .. Requiring precise uniformity would not only be unworkable, it would effectively eliminate the death penalty. Indeed, the jury is directed to tailor its decision to the individual circumstances of the crime.

In a proportionality review we examine the nature of the crime, the aggravating circumstance, the defendant's prior convictions and personal history.[144]

The jury found the Defendant, Jonathan Lee Gentry, guilty of premeditated first degree murder with the aggravating cir-

---

[144]*State v. Lord*, 117 Wn.2d 829, 910-14, 822 P.2d 177 (1991), *cert. denied*, 121 L. Ed. 2d 112 (1992); *Benn*, 120 Wn.2d at 680-93.

cumstance being concealment of his identity. The nature of the crime here was particularly brutal. The facts of this case are very similar to the *Lord* case, which we found not to be disproportionate to other similar cases. Here, the victim was even younger at 12 years old than the 16-year-old victim in *Lord*. The crime in this case apparently spanned a longer period of time and was particularly brutal; the victim was sexually assaulted and bludgeoned to death with a rock. As in the *Lord* case, the pathologist was unable to determine the exact sequence of the blows, and therefore there is no sure way to know how much the victim suffered before she died, but the apparent struggle through the forest indicates suffering and terror before she died. A brutal murder involving substantial conscious suffering of the victim makes the murderer more deserving of the death penalty.[145] As in the *Lord* case, this murder was more vicious and encompassed a longer period of time than in some cases where the defendants were sentenced to death.[146] It was more brutal than many murders where the death penalty was not imposed.

The Defendant's prior criminal record showed a history of violent behavior. He had killed before and had raped a 17-year-old girl at knife point not long before this murder. The Defendant's death sentence is not disproportionate on the basis of his criminal record. Furthermore, the mitigating circumstances were not as deserving of mercy as in some other cases where the death sentence was imposed. *See Rice* (severe mental disturbance); *Dodd* (severe childhood abuse). There is no indication of lack of normal intelligence or mental disease and Gentry was not youthful as in some cases where the death penalty was not imposed. *See, e.g., State v. Ortiz*, No. 1 (defendant retarded); *State v. Caffrey*, No. 93 (defendant mentally ill); *State v. Stohs*, No. 82 (defendant 19 years old); *State v. Reite*, No. 84 (defendant 20 years old).

---

[145]*See Benn*, 120 Wn.2d at 701 (Utter, J., dissenting); *State v. Rupe*, 108 Wn.2d 734, 787, 743 P.2d 210 (1987) (Pearson, C.J., dissenting), *cert. denied*, 486 U.S. 1061 (1988).

[146]*Lord*, 117 Wn.2d at 912 and cases cited therein.

We consider it particularly important in this case that the Defendant had been convicted of a prior violent felony which had resulted in the victim's death, that shortly before this murder the Defendant had raped a teenage girl at knife point, that the Defendant murdered an innocent child, that the child suffered substantial pain and terror before her death and that the mitigating circumstances were relatively weak. Given the brutal nature of the crime, the tender years of the victim, the prior convictions of the Defendant and the lack of compelling mitigating circumstances, we conclude that the sentence was not excessive or disproportionate.

No evidence is offered by the Defendant of any passion or prejudice apart from that alleged in other issues and addressed above. The allegation of passion or prejudice argued to have resulted from the introduction of victim impact evidence is addressed above in the discussion of that issue. In *Benn* and *Lord*, we rejected the defendants' reiterations of alleged trial errors addressed in other parts of the defendants' appeals as support for a passion or prejudice argument.[147] No independent allegation of passion or prejudice is made and we found no evidence of any in the record.

The conviction is affirmed and the case is remanded for issuance of a death warrant.

BRACHTENBACH, DOLLIVER, DURHAM, SMITH, and GUY, JJ., concur.

UTTER, J. (dissenting) — The majority of this court approves the admission of unreliable evidence in criminal cases. To the extent it does so, it invites freeing those who may be guilty and convicting those who may be innocent. Both the National Academy of Sciences Report, on which this court relied in a previous case, and the testimony of the scientists at the *Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923) hearing established that, at the time of Gentry's trial, polymerase

---

[147]*State v. Benn*, 120 Wn.2d 631, 693, 845 P.2d 289, *cert. denied*, 114 S. Ct. 382 (1993); *Lord*, 117 Wn.2d at 914-15.

chain reaction (PCR) deoxyribonucleic acid (DNA) evidence was not yet generally accepted as a methodology capable of consistently producing reliable results on forensic samples. Furthermore, admission of the PCR evidence in this case is problematic because the scientist performing the testing failed to follow the manufacturer's protocols. Accordingly, the PCR evidence should not have been introduced because it fails the second prong of the *Frye* test, which requires a methodology to be generally accepted before its results may be admitted in court.

I also dissent because Gentry's sentence is arbitrary and capricious under RCW 10.95.130(2)(b) when viewed against other aggravated murder cases which did not result in the penalty of death.

## I
### ADMISSIBILITY OF PCR UNDER FRYE

The admissibility of novel scientific evidence in this jurisdiction is governed by the *Frye* test. *See Frye v. United States,* *supra* at 1014. That *Frye* test permits the admission of evidence deriving from a scientific theory or principle only if the theory or principle has achieved "general acceptance in the relevant scientific community". *State v. Martin,* 101 Wn.2d 713, 719, 684 P.2d 651 (1984).

The *Frye* test has two prongs: (1) whether there is a theory which has achieved general acceptance in the scientific community, and if so, (2) whether the technique used to implement that theory is also generally accepted in the scientific community. *State v. Cauthron,* 120 Wn.2d 879, 888-89, 846 P.2d 502 (1993). If a significant dispute exists among qualified experts as to the validity of the scientific evidence, either as to the underlying theory or its implementing technique, it may not be admitted. *Cauthron,* 120 Wn.2d at 887. A third prong, which inquires whether the technique was properly carried out in a given instance goes to weight, not admissibility. *Cauthron,* 120 Wn.2d at 889; *State v. Kalakosky,* 121 Wn.2d 525, 540, 852 P.2d 1064 (1993).

Adherence to the *Frye* test was recently reiterated in *State v. Cauthron,* 120 Wn.2d at 886-89, which held restricted frag-

ment fragment length polymorphism DNA (RFLP-DNA) evidence admissible. In deciding whether RFLP testing was admissible under the *Frye* standard in *Cauthron*, this court looked to a new and exhaustive report issued by the Comm. on DNA Technology in Forensic Science, *DNA Technology in Forensic Science* (Nat'l Academy Press 1992) (*NRC Report*). Relying on the report, the majority held that RFLP had achieved general acceptance in the forensic context, and as such was admissible under *Frye. See State v. Cauthron, supra.*

The same *NRC Report* states that PCR testing has *not* achieved full acceptance in the *forensic* context:

> In summary, it is well established that one can greatly amplify a locus with authenticity and that one can reliably detect alleles or sequence variation at the amplified locus with any of a number of techniques. PCR analysis is extremely powerful in medical technology, but *it has not yet achieved full acceptance in the forensic setting.* The theory of PCR analysis, even though it is the analysis of synthetic DNA, as opposed to the natural sample, is scientifically accepted and has been accepted by a number of courts. However, most forensic laboratories have invested their energy in development of RFLP technology and have left the development of forensic PCR technology to a few other laboratories. *Thus, there is no broad base of experience in the use of the technique in identity testing.*
>
> . . . .
>
> *In general, further experience should be gained with respect to PCR in identity testing.* Information on the extent of the contamination problem in PCR analysis and the differential amplification of mixed samples needs to be further developed and published. A great deal of this information can be obtained when a number of polymorphic systems are available for PCR analysis. Ambiguous results obtained with a number of polymorphic markers will signal contamination or mixtures of DNA in a sample.
>
> Quantification of PCR results needs to be explored, to make the results *more reliable.* Laboratories that gain experience with PCR should determine the relationship between cycle number and percentage of contaminating DNA easily detected for each system used. Control primers that amplify small amounts of DNA reliably and robustly need to be added to test amplifications. In general, information derived from the new polymorphic loci under standardized conditions with easily quantifiable results or end points is needed. Considerable advances in the use of PCR in forensic analysis can be expected soon; the method had enormous promise.

(Italics mine.) *NRC Report*, at 70.

The *NRC Report* clearly indicates that PCR testing is subject to technical difficulties which may substantively affect the *reliability* of the results produced. The *NRC Report* also specifically states that these problems, namely differential amplification, contaminated samples, and mixed samples, *have not yet been adequately addressed.* For that reason, this methodology had not yet achieved general acceptance in forensic testing.

The error of concluding PCR has achieved general acceptance in the scientific community for testing on forensic samples was comprehensively set forth in the dissent in *State v. Russell*, 125 Wn.2d 24, 882 P.2d 747 (1994). The dissent's reasoning in *Russell*, in which I fully concurred, applies with equal force here. Because the evidence fails to meet the part of *Frye* which requires general acceptance of the implementing technique at issue, the trial court erred in admitting it.

Even disregarding the conclusion of the *NRC Report*, which is singularly awkward given this court's reliance on that report in *State v. Cauthron, supra,* the testimony at the *Frye* hearing established the numerous difficulties associated with producing reliable results when PCR is applied to forensic samples. The testimony indicated that the reliability of PCR testing in the forensic context is at the very least the subject of significant controversy in the scientific community. Accordingly, the majority's treatment of it as generally accepted is untenable.

The evidence presented at the 6-week *Frye* hearing included seven expert witnesses and the forensic scientist, Dr. Blake, who conducted the tests whose admissibility is at issue here.

The experts at the hearing could not agree. That testimony, summarized below, establishes beyond any doubt that the majority's conclusion the evidence is admissible under *Frye* because it is generally accepted is erroneous.

The following scientists testified for the State: Haig H. Kazazian, Jr., M.D., Henry A. Erlich, Ph.D., Stephen P. Daiger, Ph.D., Cecilia Hlavaty von Beroldingen, Ph.D., and Edward T.

Blake, Ph.D. For the defense were Aimee Bakken, Ph.D., Ashok Bhagwat, Ph.D., and Mr. David Adler. An affidavit from Dr. Richard Roberts was also admitted.

Dr. Haig Kazazian, Jr., director of the Center for Medical Genetics at Johns Hopkins, had used PCR for medical diagnosis but had never tested crime scene evidence. He testified that PCR can be used on degraded and old samples. He stated he had reviewed the Cetus Corporation's PCR kit, which he had not used, and that the procedures would be generally accepted in the scientific community. 10 Report of Proceedings, at 280; 11 Report of Proceedings, at 444-45.

Dr. Kazazian reviewed Dr. Blake's conclusions and stated the results appeared to be accurate. 10 Report of Proceedings, at 292-93. At the time of his testimony he was a member of the National Research Committee of the National Academy of Sciences, which had not released its report on DNA. Because it was confidential, Dr. Kazazian testified he could not reveal its contents but that to the best of his knowledge there was a consensus of the committee on the use of the Cetus DQ-alpha technology for forensic purposes. 10 Report of Proceedings, at 247, 250.

Dr. Roberts, a molecular biologist, has worked with DNA since 1972 and was the assistant director for research at Cold Spring Harbor in New York. His affidavit concluded that there is not a generally accepted method to assure the PCR amplification is of the product sought to be amplified rather than of a contaminant. He concluded that "at our present state of knowledge, or ignorance, it would be imprudent to rely upon data obtained solely by the PCR method." He also reviewed the PCR testing Dr. Blake performed in this case and concluded he could not agree with Dr. Blake that the shoelace bloodstains unequivocally showed a genotype of 1.2, 3, because there was contamination in the control which showed a 1.1 allele. Ex. 15 (Frye).

Dr. Henry A. Erlich is a geneticist and director of the Human Genetics Department at Cetus Corporation, and has been used as an expert in other criminal trials. 11 Report of Proceedings, at 471, 466; 12 Report of Proceedings, at 496.

He testified that PCR is reliable if the person understands the principles of PCR, carries out the reactions carefully and knows how to interpret the data. 12 Report of Proceedings, at 543.

The trial court admitted for cross examination purposes an affidavit written by C. Thomas Casey, M.D., the chairman of the Institute for Molecular Genetics at Baylor College of Medicine and the medical director of a DNA diagnostic laboratory at Baylor. His affidavit was written in October 1989 for use in the *McSherry* case. *People v. McSherry*, 14 Cal. Rptr. 2d 630 (1992) (ordered withdrawn from publication in official reporter). His affidavit concludes PCR testing is new, not yet validated, and that the testing result excluding the defendant, McSherry, as a source of the DNA was incorrect. Dr. Erlich testified he thought Dr. Casey had changed some of his opinions since writing the *McSherry* affidavit. 13 Report of Proceedings, at 711.

An affidavit from Dr. Kenneth K. Kidd, professor of genetics, biology and psychiatry at Yale University School of Medicine, concluded he was unaware of any literature that addresses the problems of PCR evidence in the forensic context.

Dr. Edward T. Blake, a forensic serologist with a doctorate in criminology who has previously testified regarding PCR-DNA evidence, performed the PCR tests in this case. He typed the blood on both of Gentry's shoelaces. In the first testing, conducted July 1989, he was unable to obtain any DNA typing because the material removed from the shoelaces inhibited the amplification reaction, 20 Report of Proceedings, at 1286-88; Ex. 4, at 3 (Frye). However, when he ran PCR tests again in April 1990, he concluded that the genotype on each shoelace was 1.2, 3, consistent with the genotype of the victim. 13 Report of Proceedings, at 853; 20 Report of Proceedings, at 1288, 1221; Ex. 4 (Frye).

Dr. Blake described the PCR DQ-alpha test and the controls he used to avert laboratory contamination. He testified further that his laboratory, Forensic Science Associates, was the only crime laboratory routinely using PCR on crime scene evidence in August 1990. 19 Report of Proceedings, at

1151. By March 1991, several other labs were using the test. 19 Report of Proceedings, at 1159-60, 1166. Dr. Blake testified that each type of "differential amplification", which can lead to allelic dropout and a mistyping of the sample, has its own remedies. 20 Report of Proceedings, at 1193-94.

Stephen P. Daiger, Ph.D, a professor of medical genetics at the University of Texas, testified that PCR in the forensic context poses a relatively low, but measurable, probability that there will be a differential amplification (causing allelic dropout) and that it would typically lead to the erroneous exclusion of a suspect. 18 Report of Proceedings, at 817-18. He testified that the presence of two alleles in the *Gentry* test argued against allelic dropout in this case. 18 Report of Proceedings, at 924-25. He also acknowledged the danger of contamination in the forensic setting but stated that certain measures could help to eliminate contamination. 18 Report of Proceedings, at 912-15. He testified that the reverse dot blot testing done here was generally accepted in the scientific community, 18 Report of Proceedings, at 920, and that the population genetics data bases were generally accepted as reliable, 18 Report of Proceedings, at 925-26. He found Dr. Blake's results acceptable and opined the Cetus DQ-alpha protocols would be generally accepted in the scientific community. 18 Report of Proceedings, at 923, 1016.

Cecilia Hlavaty von Beroldingen, Ph.D, a forensic DNA specialist with the Oregon State Police Crime Laboratory, testified that using DQ-alpha PCR method for forensic casework does not alter the usual PCR amplification, but that in forensic samples the DNA may be exposed to environmental insults that damage the DNA and may be comprised of mixed samples, *i.e.*, mixtures of biological stains from two different individuals. 23 Report of Proceedings, at 1616, 1655. She reviewed Dr. Blake's report and agreed with its results. 23 Report of Proceedings, at 1609-10. She described the possibility of allelic dropout (the preferential amplification or differential amplification) as a phenomenon which results in the number 1 allele not being detected because it is not amplified. She opined this had not occurred in the

*Gentry* case because there was amplification of the number 1 allele. 23 Report of Proceedings, at 1613.

Ashok S. Bhagwat, Ph.D., a professor of chemistry at Wayne State University, with 12 years' experience working with DNA, but who has not done forensic testing, testified that the differences between PCR testing in the research lab and in the forensic context are substantial and that PCR testing is not generally accepted in the scientific community for testing on crime scene evidence because of the problems of contamination and limited samples preventing duplicate testing. 28 Report of Proceedings, at 2238-40, 2290. With regard to contamination, he stated that PCR is so powerful that a single cell contamination could be devastating to the result and that the problem of contamination is unlikely to be easily solved for evidence arising from crime scenes. 28 Report of Proceedings, at 2238-39. He testified that unless there was sufficient sample to perform duplicate testing, the scientific community would not accept the results as reliable. 28 Report of Proceedings, at 2239. He reviewed an article by Westwood and Werrett, *An Evaluation of the Polymerase Chain Reaction Method for Forensic Applications*, Forensic Science Int'l (1990), and concluded that it raised serious questions about the application of the Cetus DQ-alpha kit and the reverse dot blot use for interpreting forensic evidence. See 28 Report of Proceedings, at 2253; Ex. 86 (Frye). He also reviewed the article *Use of Formamide to Improve Amplification of HLA DQ-alpha Sequences*, by Comey, Jung and Budowle, vol. 10 BioTechniques no. 1 (1991), and concluded that it said that allelic dropout could occur in the PCR amplification process even if the temperature in the thermal cycler was properly maintained. 28 Report of Proceedings, at 2286; Ex. 87 (Frye).

Dr. Bhagwat testified it was not possible to report a reliable result from the tests run on Gentry's shoelaces because the controls taken from an unstained part of the shoelace showed DNA and the allele in that control did not show up on the test of the bloodstain. 28 Report of Proceedings, at 2256-57. Dr. Bhagwat agreed with Dr. Robert's affidavit that

PCR was not yet generally accepted for use on forensic samples. 28 Report of Proceedings, at 2252-53.

Mr. David Adler is a research associate and faculty member at the University of Washington with a masters degree in molecular biology who has conducted thousands of PCR tests, but not in the forensic setting. 29 Report of Proceedings, at 2385-90. He testified the Cetus DQ-alpha PCR kit was not generally accepted by the scientific community as reliable for use on crime scene evidence, 29 Report of Proceedings, at 2397, and testified regarding the problems in understanding the thermodynamics, mixed samples and limited samples making duplicate testing impractical. 29 Report of Proceedings, at 2398-2401. He also criticized the *Gentry* test conclusions because of contamination in the environmental controls in the shoelaces, and because there was no duplicate testing. 29 Report of Proceedings, at 2440-44.

Aimee Hayes Bakken, Ph.D., is a professor and researcher in biology at the University of Washington who has not done any DNA testing on crime scene evidence and has not personally performed PCR testing. 27 Report of Proceedings, at 2086-87, 2168. She testified Dr. Blake's conclusions in the *Gentry* case would not be generally accepted in the scientific community. 27 Report of Proceedings, at 2097. From reading the literature, she concluded that PCR is not generally accepted in the scientific community for forensic use as it is still an evolving technique. 27 Report of Proceedings, at 2176.

The majority's approval of the admission of PCR evidence in this case is erroneous because it treats as generally accepted a testing method which the *NRC Report* and the testimony indicated was not generally accepted at the time it was admitted. Admission of the evidence is also problematic because Dr. Blake deviated from the manufacturer's protocols in conducting the testing. See 27 Report of Proceedings, at 2132. See also 20 Report of Proceedings, at 1217, 1219. The majority does not address this aspect of the case. It stands to reason, however, that even if there were a generally accepted methodology by which to conduct PCR testing, it would remain an issue

whether the scientist conducting the test so deviated from the generally accepted protocols of that methodology that it could no longer properly be said he followed that generally accepted methodology. *See NRC Report*, at 55 (repeatedly emphasizing that testing should be conducted with proper protocols, and that evidence should not be admitted in court absent rigorous indicia that reliable methods and standards were used).

In sum, when PCR DNA evidence was admitted at the time of Gentry's trial, there was acceptance of the scientific theory underlying PCR DNA evidence, but no consensus about the reliability of its implementing techniques *in the forensic context*. Furthermore, even if there were a generally accepted methodology, there is no testimony it was followed in this case. The evidence was therefore inadmissible and should have been excluded by the trial court.

## II

### PROPORTIONALITY

I also take issue with the majority's proportionality analysis. Contrary to the majority's conclusion, the death penalty is not proportionate under RCW 10.95.130(2)(b).

RCW 10.95.130(2)(b) requires this court to consider whether the "sentence of death is excessive or disproportionate to the penalty imposed in similar cases".

A sentence is excessive or disproportionate if it has not "*generally* been imposed in similar cases". (Italics mine.) *In re Jeffries*, 114 Wn.2d 485, 490, 789 P.2d 731 (1990); *State v. Rupe*, 108 Wn.2d 734, 767, 743 P.2d 210 (1987), *cert. denied*, 486 U.S. 1061 (1988); *State v. Lord*, 117 Wn.2d 829, 939, 822 P.2d 177 (1991) (Utter, J., dissenting), *cert. denied*, 121 L.Ed. 2d 112 (1992). A sentence is not "generally" imposed unless it is imposed in at least 50 percent of similar cases. *State v. Jeffries*, 105 Wn.2d 398, 437, 717 P.2d 722 (Utter, J., dissenting), *cert. denied*, 479 U.S. 922 (1986); *Lord*, 117 Wn.2d at 939.

The legislative requirement that we determine whether the death penalty is generally imposed in similar cases does not require this court to match with exactitude one murder

case against another. However, if it cannot reasonably be said the death penalty generally is imposed in cases sharing similar features, or in worse cases, it cannot be proportionate under RCW 10.95.130(2)(b).

Imposition of the sentence of death is not always disproportionate. In *State v. Dodd*, 120 Wn.2d 1, 838 P.2d 86 (1992), the sentence of death was not disproportionate because there were no similar cases in which the death penalty had not been imposed. It was therefore possible to reasonably conclude the penalty of death under RCW 10.95.130(2)(b) was not imposed arbitrarily and capriciously. That case involved the multiple murder of children who died after prolonged torture, one after as many as 14 hours of torture. The aggravated murder reports describe the facts as gruesome "due to the victims' ages [11, 12 and 4], defendant's extreme degree of sexual preoccupation, and the obsession with possibility of vivisecting children". Report of the Trial Judge (Aggravated Murder Report) (Dodd) No. 76, at 12. The trial judge commented on his case, "I have practiced criminal law as an attorney and a judge for 31 years, and this ranks among the most heinous that I've been involved in out of some 40 or 50 homicides over those years." Report of the Trial Judge (Aggravated Murder Reports) (Dodd) No. 76, at 13.

Similarly, it was possible in *State v. Rice*, 110 Wn.2d 577, 757 P.2d 889 (1988) to uphold the penalty of death under RCW 10.95.130(2)(b). In that case, too, the nature of the crime, involving extreme and gratuitous brutality in the murder of an entire family, including children, made it possible to conclude the penalty of death was not being visited on the defendant arbitrarily or capriciously.

The same simply cannot be said here. The most salient features in this case are the age of the victim, the sexual assault, the seriousness of Gentry's criminal history, which includes a manslaughter conviction and a rape conviction, and the paucity of mitigating evidence. The majority correctly identifies these salient features, but fails to engage in a discussion of their relevance in a manner that explains why equally, or arguably more, heinous cases which did not

result in the penalty of death. Under the circumstances, the penalty of death cannot be considered other than arbitrary.

The cases below, culled from the Aggravated Murder Reports, involve multiple murders, murder involving extreme and prolonged suffering on the part of the victim, and a victim particularly vulnerable due to age. In none of these cases was the penalty of death imposed. The majority's resolution of the proportionality issue cannot account for murder cases arguably worse than this one in which the prosecutor either did not seek, or the jury did not impose, the death penalty. To the extent that is true, the death penalty cannot be considered proportionate in this case.

Martin Sanders (No. 81). Sanders killed two children after raping them. Aggravating factors were multiple victims, rape, concealment and common scheme or plan. He had convictions for kidnapping, assault, and rape. No mitigating circumstances appear in the report. He received life without the possibility of parole.

Stephen Carey (No. 10). Carey murdered his estranged wife and 18-month-old child by setting their trailer on fire. *See State v. Carey*, 42 Wn. App. 840, 714 P.2d 708, *review denied*, 106 Wn.2d 1003 (1986). The wife survived 18 hours before she died of third degree burns over 100 percent of her body. The aggravating circumstance was arson. The report lists no mitigating circumstances. He received life without the possibility of parole.

Cherno Camara (No. 130). Camara murdered two of his children with a hatchet and struck his former wife in the leg with a hatchet, causing a severe laceration. She escaped and survived. Camara had a prior conviction for fourth degree assault and for the unlawful display of a weapon. The report indicates he suffered from post traumatic stress disorder. The jury did not impose the death penalty.

Minviluz Macas (No. 101). Macas set fire to her house, killing her 85-year-old husband and two of her children, ages 9 and 11. She had no prior record. The State did not seek the death penalty.

Stanley Runion (No. 99). Runion killed a child and two adults after taking them hostage. He had two convictions for assault with a deadly weapon. No mitigating circumstances are listed in the report. He received life without the possibility of parole.

Arnold Roy Brown (No. 2). Brown raped and murdered his 7-year-old niece. He had prior convictions for assault, theft, and burglary. No mitigating evidence appears in the appellate reports. The jury did not impose the death penalty. The judge commented that the jury's failure to do so was inappropriate because there were no mitigating circumstances.

Davis James Dayton (No. 78). Dayton murdered a 3-year-old neighbor. The victim was stabbed repeatedly with a knife and hit over the head numerous times. Dayton had multiple prior burglary convictions. No mitigating evidence appears in the report. He received life without the possibility of parole.

Herbert Rice, Jr. (No. 70). Rice murdered an elderly couple. The victims were tortured and mutilated before being killed. Each was aware of the other's suffering. The woman was stabbed as many as 85 times. The man's stab wounds were so extensive the forensic expert indicated he had never before encountered such a case. The expert indicated also that the victims did not die quickly. The aggravating circumstances were multiple victims, robbery, burglary, and concealment. The jury did not impose the death penalty.

Lawrence Sullen (No. 69). Sullen killed a husband and wife and beat and shot their 11-year-old daughter. She survived and was left in the house when Sullen set fire to it. The aggravating circumstances were multiple victims, common scheme or plan, and concealment. No mitigating circumstances are listed in the report. He was sentenced to life without the possibility of parole.

Jonathon Woods (No. 64). Woods abducted an 89-year-old woman, stuffed her into a trunk for 2 to 4 hours and shot her several times in the legs before he shot her in the head. The aggravating circumstances were the crime was one of revenge against a former witness, was committed to conceal

defendant's identity, and occurred in the course of a robbery, burglary, and kidnapping. He had two prior convictions for burglary and one for robbery. The jury was unable to unanimously agree. He received life without parole.

Jeffrey Lane (No. 65). Lane was the codefendant of Woods (listed above). The same aggravators were present. The jury did not impose the death penalty.

William Pawlyk (No. 116). Pawlyk murdered his former girlfriend and her boyfriend. Both victims were stabbed over 100 times. It is inferable the victims experienced great suffering before they died. Pawlyk had no prior record. He pleaded insanity which the jury rejected. The State did not seek the death penalty. He received life without the possibility of parole.

It is evident from the above discussion that the death penalty is not generally imposed even in multiple homicide cases of particularly vulnerable victims. Nor is the death penalty generally imposed where the victim endured more prolonged agony before dying than did Gentry's victim. Under these circumstances, the imposition of the death penalty on Gentry cannot be considered proportionate under RCW 10.95.130(2)(b).

JOHNSON, J., concurs with UTTER, J., in issue I.

JOHNSON, J. (dissenting) — The majority errs in concluding victim impact statements in the penalty phase of a capital case are admissible under Washington law. It effectively has created a sentencing proceeding in which the adversaries are not the defendant and the State, but rather the defendant and the victim. The majority relies on this characterization to extend the Victims' Rights Amendment beyond its explicit and historical meaning, and in unwarranted contravention of article 1, sections 3 and 14 of the Washington Constitution, to apply to special sentencing proceedings in death penalty cases.

The argument that a criminal prosecution requires an evenhanded balance between the State and the defendant

fundamentally misconceives the nature and purpose of state and federal constitutional criminal protections. One purpose of affording constitutional rights to accused individuals and imposing limits on the State is to protect accused individuals from overreaching by the disproportionately powerful State. *Payne v. Tennessee*, 501 U.S. 808, 860, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991) (Stevens, J., dissenting). *See also Pulley v. Harris*, 465 U.S. 37, 45, 79 L. Ed. 2d 29, 104 S. Ct. 871 (1984) (constitutional review of death penalty statutes is to avoid "wholly arbitrary, capricious, or freakish sentences"); *State v. Cater's Motor Freight Sys., Inc.*, 27 Wn.2d 661, 667, 179 P.2d 496 (1947) (due process guaranty protects individuals from arbitrary exercise of powers of government).

I therefore dissent as to issue 12.

## I

The decision is left to the states whether to admit victim impact statements in the sentencing phase of death penalty cases. *Payne*, 501 U.S. at 827. In Washington, capital punishment proceedings are regulated by statute, subject to specific constitutional limits. The special sentencing proceeding held determines whether the death penalty should be imposed or whether there are sufficient mitigating circumstances to merit leniency. RCW 10.95.030-.060. RCW 10.95.070 contains a list of factors the jury may consider, all of which relate specifically to the defendant's culpability for the capital offense. Victim impact statements are not mentioned.

Our case law has further defined limits on admissible evidence. In *State v. Bartholomew*, 98 Wn.2d 173, 654 P.2d 1170 (1982) (*Bartholomew* I), *State's cert. granted and remanded*, 463 U.S. 1203, *defendant's cert. denied*, 463 U.S. 1212 (1983), *reaff'd on remand*, 101 Wn.2d 631, 683 P.2d 1079 (1984) (*Bartholomew* II), we found portions of RCW 10.95.060(3) and RCW 10.95.070 to be unconstitutional. In the special sentencing proceeding, the jury may consider mitigating factors only and the prosecution may introduce

only the defendant's criminal record,[148] evidence of the facts and circumstances of the murder for which the defendant is being sentenced (if the sentencing jury is not the jury that convicted the defendant), and evidence of "additional nonstatutory aggravating factors" insofar as its rebuttal value outweighs its prejudicial effect. *Bartholomew* I, 98 Wn.2d at 197-99; *Bartholomew* II, 101 Wn.2d at 642-43.

The United States Supreme Court accepted certiorari in *Bartholomew* I and remanded the case for reconsideration in light of *Zant v. Stephens*, 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983) (statutory procedure for determining eligibility for death penalty adequately confines the class of persons eligible to a narrow category in which there is special justification for the imposition of a death sentence compared to others found guilty of murder). On remand, we reaffirmed *Bartholomew* I, concluding different criteria apply to aggravating factors than to mitigating factors, thereby imposing a more stringent standard upon the prosecution than the defendant at the sentencing phase of a capital case. *Bartholomew* II, 101 Wn.2d at 637-38. We identified two primary federal and state constitutional limits on the admission of aggravating factors at a special sentencing proceeding, both of which are necessary to afford the defendant a fair trial: (1) evidence prejudicial to the defendant cannot be admitted at the sentencing phase; and (2) evidence admitted during the sentencing phase of capital cases, just as in all other criminal cases, must be accurate and reliable. *Bartholomew* II, 101 Wn.2d at 636-38.

In *Bartholomew* II, we also noted that the Washington Constitution, article 1, sections 3 and 14, provides broader protection than the Supreme Court's interpretation of the Eighth and Fourteenth Amendments. *Bartholomew* II, 101 Wn.2d at

---

[148]Evidence of uncharged criminal behavior can be offered to rebut mitigation evidence presented by the defendant. *State v. Lord*, 117 Wn.2d 829, 889, 822 P.2d 177 (1991), *cert. denied*, 506 U.S. 856, 121 L. Ed. 2d 112, 113 S. Ct. 164 (1992), *clarified in In re Lord*, 123 Wn.2d 737, 870 P.2d 964, *cert. denied*, ___ U.S. ___, 130 L. Ed. 2d 86, 115 S. Ct. 146 (1994).

639. *See also State v. Chrisman*, 100 Wn.2d 814, 817-18, 676 P.2d 419 (1984) (federal constitution provides only "minimal rights" and decisions of federal courts do not limit the right of state courts to accord greater rights). Accordingly, while we rested our decision on an interpretation of both the state and federal constitutions, we explicitly held the Washington Constitution to compel our result:

> [T]he independent state constitutional grounds we have articulated are adequate, in and of themselves, to compel the result we have reached. . . . Therefore, any decision by the Supreme Court limiting federal constitutional guaranties in a manner inconsistent with our interpretation of Const. art. 1, §§ 3 and 14 will have no bearing on our decision in this case.

*Bartholomew* II, 101 Wn.2d at 644.[149]

The result in *Bartholomew* II therefore is unaffected by the Supreme Court's constriction of Eighth Amendment protection in *Payne*. The Eighth Amendment imposes a minimum threshold below which the death penalty cannot be imposed and it prohibits the states from limiting the sentencer's consideration of any relevant circumstance that could cause the sentencer to decline to impose the death penalty. *Romano v. Oklahoma*, 512 U.S. 1, 129 L. Ed. 2d 1, 10, 114 S. Ct. 2004 (1994); *Payne*, 501 U.S. at 824; *McCleskey v. Kemp*, 481 U.S. 279, 306, 95 L. Ed. 2d 262, 107 S. Ct. 1756 (1987); *Lockett v. Ohio*, 438 U.S. 586, 604, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978). Beyond these limitations, the State may choose which substantive factors are relevant to death penalty determinations; the Supreme Court explicitly left to the states the decision whether to allow victim impact statements in death penalty sentencing. *Payne*, 501 U.S. at 824-25.

---

[149]We repeatedly have followed or acknowledged the holdings of *Bartholomew* II. *See, e.g., State v. Jeffries*, 105 Wn.2d 398, 416, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986); *State v. Rupe*, 108 Wn.2d 734, 755, 762, 743 P.2d 210 (1987), *cert. denied*, 486 U.S. 1061 (1988); *State v. Rice*, 110 Wn.2d 577, 609, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910 (1989); *In re Rupe*, 115 Wn.2d 379, 396 n.5, 798 P.2d 780 (1990); *Lord*, 117 Wn.2d at 889-91; *State v. Ortiz*, 119 Wn.2d 294, 304, 831 P.2d 1060 (1992); *State v. Dodd*, 120 Wn.2d 1, 21-22, 838 P.2d 86 (1992).

## II

The majority concludes correctly that the victims' rights amendment, article 1, section 35,[150] does not specifically repeal any provision of the Washington Constitution or this court's construction of any constitutional provision, nor is the amendment in unavoidable conflict with another provision. Majority, at 625. The majority also concludes correctly that the due process and cruel punishment provisions of the state constitution, Const. art. 1, §§ 3 and 14,[151] as construed by this court in *Bartholomew* II, require evidence proffered in special sentencing proceedings to conform to the Rules of Evidence. Majority, at 622. As we wrote in *Bartholomew* II,

> It makes no sense to afford these protections to one charged with a lesser crime but then suspend them in a capital case. We will not do so, for this would place a defendant facing the death penalty in the perilous position of having to rebut potentially unreliable or unreasonably prejudicial evidence before a jury that has already convicted him of aggravated murder. *To suspend these protections which are afforded all other criminally charged defendants at such a critical phase of a capital case is contrary to the reliability of evidence standard embodied in the due process clause of our state constitution.* Const. art. 1, § 3.

(Italics mine.) *Bartholomew* II, 101 Wn.2d at 640-41.

The death penalty differs qualitatively from all other punishments because of its severity and finality; therefore, it is

---

[150]Article 1, section 35 reads, in relevant part: "To ensure victims a meaningful role in the criminal justice system and to accord them due dignity and respect, victims of crimes are hereby granted the following basic and fundamental rights.

". . . [A] victim of a crime charged as a felony shall have the right to be informed of and, subject to the discretion of the individual presiding over the trial or court proceedings, attend trial and all other court proceedings the defendant has the right to attend, and to make a statement at sentencing and at any proceeding where the defendant's release is considered, subject to the same rules of procedure which govern the defendant's rights. In the event the victim is deceased, incompetent, a minor, or otherwise unavailable, the prosecuting attorney may identify a representative to appear to exercise the victim's rights." Const. art. 1, § 35 (amend. 84).

[151]Article 1, section 3 provides "[n]o person shall be deprived of life, liberty, or property, without due process of law". Article 1, section 14 provides "[e]xcessive bail shall not be required, excessive fines imposed, nor cruel punishment inflicted".

critical that the determination to impose the death penalty be reliable. *State v. Lord*, 117 Wn.2d 829, 888, 822 P.2d 177 (1991) (citing *Johnson v. Mississippi*, 486 U.S. 578, 584, 100 L. Ed. 2d 575, 108 S. Ct. 1981 (1988); *Bartholomew II*, 101 Wn.2d at 638), *cert. denied*, 506 U.S. 856, 121 L. Ed. 2d 112, 113 S. Ct. 164 (1992), *clarified in In re Lord*, 123 Wn. 2d 737, 870 P.2d 964, *cert. denied*, ___ U.S. ___, 130 L. Ed. 2d 86, 115 S. Ct. 146 (1994). *See also Murray v. Giarratano*, 492 U.S. 1, 8, 106 L. Ed. 2d 1, 109 S. Ct. 2765 (1989) (United States Constitution places special constraints on procedures used to convict an accused of a capital offense and to sentence him or her to death, in order to ensure the existence of a greater degree of reliability); *Lockett*, 438 U.S. at 604 (finality of death penalty requires a greater degree of reliability when it is imposed). The need for greater reliability is reflected in the statutorily mandated procedure for requesting the death penalty and the required special sentencing proceedings to determine whether the death penalty should be imposed once guilt has been established. RCW 10.95; *State v. Rice*, 110 Wn.2d 577, 607, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910 (1989). Hence, notwithstanding the Victims' Rights Amendment, Washington Constitution, article 1, sections 3 and 14, continues to require that evidence admitted in special sentencing proceedings in capital cases conform to the Rules of Evidence.

The Rules of Evidence provide the "stringent procedural safeguards" necessary to ensure sentencing proceedings are fundamentally fair, as required by article 1, sections 3 and 14. *Bartholomew II*, 101 Wn.2d at 640; ER 102. Under the Rules of Evidence, courts may admit only evidence that is relevant, trustworthy, reliable, and not unreasonably prejudicial. *Bartholomew II*, 101 Wn.2d at 640-41; ER 401-403. In allowing victim impact statements to be introduced in the sentencing phase of death penalty proceedings, the majority disregards the Rules of Evidence by allowing the admission of irrelevant, untrustworthy, unreliable, and unreasonably prejudicial evidence.

When a defendant has been found guilty of aggravated first degree murder and the prosecuting attorney has complied with RCW 10.95.040, a special sentencing proceeding is conducted to determine whether the death penalty should be imposed. At this proceeding, the jury is to answer a single question: "Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?" RCW 10.95.060(4). Only evidence of mitigating circumstances and evidence "concerning the facts and circumstances of the murder" may be introduced. RCW 10.95.060(3). RCW 10.95.070 sets forth factors the jury may consider in deciding whether the defendant merits leniency. Significantly, while the list of factors is not exclusive, all factors listed relate to the defendant's personal responsibility and moral guilt, not to victim characteristics or impacts on the victim's friends and family. Accordingly, in deciding whether there are sufficient mitigating circumstances to merit leniency, the entire focus of the jury's inquiry is to be sharply limited to a balancing of the evidence of mitigating circumstances against the evidence of the facts and circumstances of the murder. *See Rice*, 110 Wn.2d at 607, 624.

Underlying this limitation is the notion, residing at the core of our criminal jurisprudence, that appropriate punishment should be imposed consistent with each defendant's personal responsibility and moral guilt, rather than in an arbitrary or unfair manner. *Tuilaepa v. California*, ___ U.S. ___, 129 L. Ed. 2d 750, 760, 114 S. Ct. 2630 (1994) (penalty phase of capital case requires "individualized sentencing and must be expansive enough to accommodate relevant mitigating evidence so as to assure an assessment of the defendant's culpability"); *Zant*, 462 U.S. at 879 (penalty phase of capital case requires "*individualized* determination on the basis of the character of the individual and the circumstances of the crime"); *Enmund v. Florida*, 458 U.S. 782, 801, 73 L. Ed. 2d 1140, 102 S. Ct. 3368 (1982) (decision

whether to impose death penalty must turn on defendant's "personal responsibility and moral guilt"); *State v. Mak*, 105 Wn.2d 692, 723, 718 P.2d 407 (penalty phase of capital case must include individualized determination based on defendant's character and record and on circumstances of the crime), *cert. denied*, 479 U.S. 995 (1986); RCW 9.94A.010 (setting forth purpose of Washington's Sentencing Reform Act of 1981). Victim impact statements, which typically present the ripple effect of the victim's death on both the victim's family and the victim's community, are irrelevant to a determination of the defendant's blameworthiness. Unless the impact on the victim's friends and family were known to the defendant at the time of the murder and have some probative bearing on an element of the crime of which the defendant was convicted, admission of victim impact statements infuses the sentencing proceeding with arbitrary factors that are wholly unrelated to an individualized determination of the defendant's personal responsibility and moral guilt. *See Bartholomew* II, 101 Wn.2d at 642-43.

Because of its inherent capacity to draw the jury's attention away from the character of the defendant and the circumstances of the crime, any probative value of victim impact statements is outweighed by its prejudicial effect. *See Payne*, 501 U.S. at 864 (Stevens, J., dissenting). Introduction of such statements invites the jury to determine the sentence based on emotional factors, the status of the victim in the community (*i.e.*, "victim worth"), or the eloquence of the victim's friends and family, rather than through rational consideration of the defendant's individual culpability. Prosecutors use victim impact statements in an attempt to show the victim's similarity to the jurors, thereby generating empathy or fear in place of reason and careful consideration. Such statements may unnecessarily supply jurors with information on the victim's race, religion, and social class, factors which ordinarily may not be considered in the sentencing decision. *See McCleskey*, 481 U.S. at 291 n.8 (violation of equal protection to base enforcement of criminal laws on unjustifiable standard such as race, religion, or other arbi-

trary classification); *Zant*, 462 U.S. at 885 (irrelevant or constitutionally impermissible factors such as race, religion, or political affiliation cannot be considered aggravating factors in capital sentencing proceedings). Admitting victim impact statements creates two classes of victims: those whose lives were so worthwhile that their killer should be put to death, and those whose lives were not so worthwhile as to require the death of the killer. No longer is sentencing based on an individualized determination of the defendant's blameworthiness, but on the jury's *post hoc* determination, in an emotional and prejudicial context, whether the defendant killed a "worthy" member of society or a less "worthy" citizen. Admission of victim impact statements thereby increases the risk that the jury will act in an arbitrary and capricious manner or make invidious distinctions as to the relative worth of the victim.

The admission of victim impact statements has the inevitable effect of putting the victim on trial, shifting the focus of the sentencing proceeding from the defendant and the nature of his or her crime to the value the victim's friends and family place on the victim's life. Inviting a detailed narration of the emotional and economic sufferings of the victim's friends and family and inquiring into their backgrounds and that of their deceased loved one revictimizes the friends and family by forcing them to relive the trauma of the crime. It places a burden on the victim's friends and family to persuade the jury of the victim's character and potential, and it pressures friends and family to provide the most graphic or emotionally wrenching statement possible in order to convince the jury of the worth of their loved one. These statements may so inflame jurors to the point where they cannot heed the trial judge's instructions, effectively preventing them from giving appropriate consideration to evidence of mitigation. These inflammatory factors cannot help but infect the jury's decisionmaking process, leading to inconsistent imposition of the death penalty, thereby rendering the sentencing proceeding fundamentally unfair and denying the due process of law guaranteed in the Washington Constitution.

## III

Victim impact statements are not relevant as a purported "balance" to the defendant's mitigation evidence, necessary to preserve victims' rights at the special sentencing proceeding. The argument that victim impact statements balance mitigation evidence reflects a flawed vision of criminal proceedings, a vision in which wronged victims may use criminal proceedings to obtain vengeance or retribution against criminal defendants. A criminal proceeding is not a private right of action for the victim's benefit; it is a proceeding in which a prosecutor, representing all the people of the State, seeks to deter, punish, restrain, and/or rehabilitate those whose actions are so dangerous or offensive that they are an affront to a civilized society. *See Bergman v. State*, 187 Wash. 622, 625, 60 P.2d 699, 106 A.L.R. 1007 (1936); 1 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 1.3(b), at 17-20 (1986).[152] *Cf.* David Boerner, *Sentencing in Washington* § 2.5 (1985) (purposes for which sentences imposed under Sentencing Reform Act of 1981).

Under RCW 10.95.040-.070, the proper counterbalance to evidence of mitigation is evidence of the facts and circumstances of the murder, including evidence of aggravation. *See State v. Benn*, 120 Wn.2d 631, 677-78, 845 P.2d 289, *cert. denied*, 510 U.S. 944, 126 L. Ed. 2d 331, 114 S. Ct. 382 (1993); *Rice*, 110 Wn.2d at 624. However, prosecutors may not use the "circumstances of the crime" as a nonstatutory aggravating factor to embrace the entire spectrum of facts present in virtually every homicide. *Maynard v. Cartwright*,

---

[152]The prosecution of crimes as an affront to the entire community is a fundamental principle of long standing in Anglo-American jurisprudence, already well established by the time of Blackstone:

> The distinction of public wrongs from private, of crimes and misdemeanors from civil injuries, seems principally to consist in this: that private wrongs, or civil injuries, are an infringement or privation of the civil rights which belong to individuals, considered merely as individuals: public wrongs, or crimes and misdemeanors, are a breach and violation of the public rights and duties due to the whole community, considered as a community, in its social aggregate capacity.

William Blackstone, *Commentaries on Laws of England* 5 (adapted by Robert M. Kerr (1962)).

486 U.S. 356, 363, 100 L. Ed. 2d 372, 108 S. Ct. 1853 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 428-33, 64 L. Ed. 2d 398, 100 S. Ct. 1759 (1980); *Rice*, 110 Wn.2d at 609. Apart from some limited statement based on evidence admissible during the guilt phase or to rebut the defendant's mitigation evidence, victim impact statements generally are unrelated to the circumstances of the crime, and therefore inadmissible. *Bartholomew* II, 101 Wn.2d at 642. Such statements are introduced for the purpose of impermissibly inviting the jury to base its decision on sympathy for the victim or the victim's friends and family, rather than as a moral response to the defendant's background, character, and crime committed. *In re Rupe*, 115 Wn.2d 379, 387-88, 798 P.2d 780 (1990). *See California v. Brown*, 479 U.S. 538, 545, 93 L. Ed. 2d 934, 107 S. Ct. 837 (1987) (O'Connor, J., concurring).

A further counterbalance is provided by the prosecutor's cross examination of defense witnesses and introduction of relevant evidence to rebut the defendant's evidence, thereby ensuring the jury receives a balanced and complete picture of the crime. *Lord*, 117 Wn.2d at 890. Even if a proffered victim impact statement were relevant to rebut the defendant's mitigation evidence, it would be inadmissible unless its rebuttal value outweighs its prejudicial effect. *Lord*, 117 Wn.2d at 890-91; *Bartholomew* II, 101 Wn.2d at 643. Because victim impact statements are inherently prejudicial, even as rebuttal evidence, such statements are unlikely to be admissible under the Rules of Evidence for any purpose during a capital sentencing proceeding.

Just as the admission of evidence of nonstatutory aggravating factors "opens too wide a door for the influence of arbitrary factors on the sentencing determination", *Bartholomew* I, 98 Wn.2d at 195, so does the admission of victim impact statements also defeat the constitutional mandate of channeled jury discretion at the sentencing phase of a capital case. *Arave v. Creech*, 507 U.S. 463, 123 L. Ed. 2d 188, 198, 113 S. Ct. 1534 (1993); *Bartholomew* II, 101 Wn.2d at 639. Admitting victim impact statements impermissibly invites the jury to make an irrational, emotional capital sen-

tencing decision, rather than one that is and appears to be based on reason. *In re Rupe*, 115 Wn.2d at 388 (citing *Booth v. Maryland*, 482 U.S. 496, 508, 96 L. Ed. 2d 440, 107 S. Ct. 2529 (1987)).

## CONCLUSION

To ensure the death penalty is not imposed arbitrarily or invidiously, the jury must find at least one aggravating factor involved in the crime. To ensure the sentence is based on an individualized determination of the defendant's moral blameworthiness, and not on passion and prejudice, the jury must weigh the aggravating factor(s), including the circumstances of the crime, against the mitigating evidence presented by the defendant. A victim impact statement presenting information about the impacts of the crime on the victim's family, friends, and community is not relevant to the jury's task and is inherently prejudicial. Admitting such a statement puts the character of the victim on trial and retraumatizes the victim's friends and family by forcing them to present emotional and graphic testimony to obtain jury sympathy.

"It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion". *Bartholomew* II, 101 Wn.2d at 638 (quoting *Gardner v. Florida*, 430 U.S. 349, 358, 51 L. Ed. 2d 393, 97 S. Ct. 1197 (1977)). By allowing the jury in a special sentencing proceeding to consider irrelevant and prejudicial statements as to the victim's worth and the suffering of the victim's friends and family, the majority invites emotional and arbitrary sentencing decisions resting on unreliable information, and allows invidious distinctions by juries impermissibly based on their sympathy with the victim, and privatizes the death penalty by permitting the victim's friends and families to seek vengeance and retaliation through state action.

UTTER and MADSEN, JJ., concur with JOHNSON, J.